PROCESSED PLASTIC COMPANY,
Plaintiff,
Counterdefendant-Appellant,

v.

WARNER COMMUNICATIONS, INC.,
Defendant-Appellee,

and

Warner Bros., Inc., Defendant,
Counterplaintiff-Appellee.

No. 81–2157.

United States Court of Appeals,
Seventh Circuit.

Submitted March 4, 1982.*

Decided April 7, 1982.

---

* After preliminary examination of the briefs, the Court notified the parties that it had tentatively decided oral argument was unnecessary. The notice provided that any party could file a "Statement as to Need for Oral Argument."

Having considered appellant's Statement as to Need for Oral Argument, the Court has concluded oral argument is not necessary. The case is submitted for decision without oral argument.

Lambert M. Ochsenschager, Reid, Ochsenschlager, Murphy & Hupp, Aurora, Ill., for plaintiff, counterdefendant-appellant.

James M. Amend, Kirkland & Ellis, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, and PELL and WOOD, Circuit Judges.

CUMMINGS, Chief Judge.

This appeal is taken by plaintiff, counterdefendant-appellant Processed Plastic Company from an order granting a preliminary injunction in favor of the defendant, counterplaintiff-appellee Warner Bros., Inc., under Section 43(a) of the Lanham Act. The preliminary injunction order granted by the United States District Court for the Northern District of Illinois, Eastern Division, enjoined the Processed Plastic Company from manufacturing or distributing toy cars bearing the symbols of origin which have become associated with Warner Bros.' "The Dukes of Hazzard" television series. For the reasons stated herein, we affirm.

The facts of this case are substantially undisputed. Plaintiff, counterdefendant-appellant, Processed Plastic Company (hereinafter "PPC") is a Delaware Corporation located in Kane County, Illinois, engaged in the manufacture and sale of plastic toy products including toy cars and other vehicles. Defendant, counterclaimant-appellee,

Warner Bros., Inc. is a major supplier of movies and television programs with a registered copyright in the "Dukes of Hazzard" television series.

In 1981 PPC modified the mold of a plastic Maverick toy car which the company had manufactured for approximately ten years previously so as to resemble a car that figures prominently in the "Dukes of Hazzard" television series, the so-called "General Lee" car.[1] In the same year PPC began producing for the first time a large plastic 1969 Dodge Charger toy car also modeled after the "General Lee."

The "General Lee" of the "Dukes of Hazzard" television series is a bright orange-colored 1969 Dodge Charger with a Confederate flag painted on the roof and the numbers "01" painted on the two side doors. The "General Lee" car appears in approximately 30% to 35% of each broadcast of the television show; it is considered by the producers to be a "star" of the show and one of the leading contributors to the show's success. The "Dukes of Hazzard" series, which has been broadcast since 1979, was ranked as the third most popular show on commercial television during the 1980–1981 season, reaching more than 46 million viewers weekly.

As modified, PPC's Maverick toy car was produced in a bright orange color, with a Confederate flag affixed to the roof and the numerals "07" on the two side doors. PPC also introduced its toy model of a 1969 Dodge Charger in a bright orange color, with a Confederate flag on the top and the numerals "07" on the side doors.

On June 1, 1981, PPC initiated this lawsuit by filing a complaint for declaratory and injunctive relief in the United States District Court for the Northern District of Illinois, Eastern Division, against Warner Communications, co-defendant herein, and its wholly-owned subsidiary Warner Bros., Inc. for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The complaint alleged that Warner Bros., Inc., in combination and conspiracy with its parent company, Warner Communications, Inc., attempted to license certain rights which it claimed arose out of its "Dukes of Hazzard" television show to manufacture a toy car named the "General Lee." Furthermore, the complaint alleged that the defendants embarked upon a campaign of harassment and predatory conduct in which the defendants threatened to enforce their claimed licensing rights through legal action for the purpose of discouraging and inhibiting the production and sale of any toys in competition with the "General Lee" toy car product.[2]

Warner Bros. had previously granted a number of toy manufacturers licenses to manufacture and sell replicas of the "General Lee". The estimated retail sales of licensed products based on the "General Lee" was over $100 million in 1981. In a motion for a temporary restraining order and a preliminary injunction Warner Bros. counterclaimed for copyright infringement under 17 U.S.C. § 101 et seq. and for trademark infringement under 15 U.S.C. § 1059 et seq. as well as under common law trademark infringement, false designation of origin and related state and common law theories of action.

The hearing on Warner Bros.' motion for a preliminary injunction was held on June 19 and 26, 1981. At the hearing Warner Bros. introduced a survey of children between the ages of 6 to 12 in which 82% of the children identified a toy car identical to

---

1. The "Dukes of Hazzard" story is about two young men, Bo and Luke Duke, who join forces to combat a local bigwig named Boss Hogg and his right-hand man, Sheriff Rosco P. Coltrane, in a fictional county called Hazzard. In their struggle to overcome corruption in Hazzard County, the Dukes of Hazzard use a customized automobile called the "General Lee" in performing car stunts, chase scenes and other action sequences.

2. As an example of such predatory conduct, PPC cited the bringing of a lawsuit by the defendants against the Gay Toy Company in the Southern District of New York wherein the district court ruled that Warner Bros. had no residual right that was enforceable. That decision, then pending on appeal, was recently reversed by the 2nd Circuit Court of Appeals. *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981) (discussed *infra*).

PPC's Maverick Rebel as the "Dukes of Hazzard" car and of that number 56% of them believed it was sponsored or authorized by the "Dukes of Hazzard" television program.

At the hearing, the vice president of PPC admitted under questioning that following the modification of the Maverick toy car and the introduction of the 1969 Dodge Charger in 1981, the company had taken four times as many orders of the toy "Rebel" cars as had ever been sold of the former Maverick toy car line in one year. The vice president attributed the upsurge in sales in part to the popularity of the "Dukes of Hazzard" television series. He also admitted that in part the choice of the late model 1969 Dodge Charger, the use of the orange color, the symbols "07" and the Confederate flag on the "Rebel" cars, were with reference to the "General Lee" car shown in the television series and in response to the demand for that particular toy car by PPC's customers. The vice president further testified that in the marketing, advertising and packaging of the "Rebel" cars no reference was made to the "Dukes of Hazzard," "Warner Bros.," or to the "General Lee".[3]

On the basis of the evidence adduced at the hearing the district court held that Warner Bros. was entitled to a preliminary injunction on its Section 43(a) infringement claim because Warner Bros. was likely to prevail on the merits of that claim and would suffer irreparable harm without adequate remedy at law unless a preliminary injunction issued. Specifically, in its preliminary injunction order of June 30, 1981, the district court found:

For purposes of this order, the two DX–20 and DX–21 toy cars being manufactured and sold by PPC infringe Warner Bros.' rights in the General Lee car as shown in "The Dukes of Hazzard" television series. Specifically, PPC's imitation of the General Lee car (DX–20 and DX–21) is a deliberate attempt to represent PPC's toy cars as replicas of Warner Bros.' General Lee car and thereby to benefit from the consumer demand created for authentic replicas by Warner Bros.' successful television series and by Warner Bros.' advertising expenditures. PPC's actions are likely to cause and have caused confusion among potential customers as to the source and sponsorship of PPC's imitations of the General Lee car.

Accordingly, the district court enjoined PPC from manufacturing, selling, or distributing toy cars bearing the symbols of origin which have become associated with Warner Bros.' the "Dukes of Hazzard" television series. PPC thereupon appealed to this court.

The issue on appeal is whether the district court abused its discretion in entering a preliminary injunction against the manufacture and sale of toy cars by PPC. PPC takes the position that the district court applied an erroneous standard in finding that Warner Bros., Inc. had a likelihood of success on the merits of its infringement claim by failing to address the issue of secondary meaning.[4] PPC argues that Warner Bros. has at best shown that the "General Lee" car is a designation of its product the "Dukes of Hazzard" television series but not an identification of the producer Warner Bros., Inc., noting in this regard that "there was never a shred of

---

**3.** The underplate of the Dodge Charger "Rebel" car displayed the PPC logo, address, and model number. However, such information did not appear on the Maverick "Rebel" car, having been inadvertently left off the mold following certain design changes in 1975. PPC took action to correct the problem during the course of the proceedings in the district court.

**4.** Although some doubt has been expressed as to whether Section 43(a) requires proof of secondary meaning, most courts have used various terminology such as "unique association" or "distinguishing characteristic" or "a quality similar to secondary meaning" to describe essentially the same requirement for relief: that the unregistered mark serve to distinguish the plaintiff's product from others by its association with a single source. See *Miller Brewing Company v. Falstaff Brewing Corporation*, 503 F.Supp. 896, 904 (U.S. R.I. 1980), *reversed on other grounds*, 655 F.2d 5 (1st Cir. 1981); *see generally* J. Gilson, *Trade Mark Protection and Practice* § 702[1] (1979).

evidence that consumers even believed the 'General Lee' was sponsored by Warner Bros." Thus according to PPC the Warner Bros.' survey fails to address the "critical issue" since it only indicates that "some small children thought the PPC car was sponsored or authorized by 'The Dukes of Hazzard' television program."

■ However, this Court has previously noted that to establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer which produces a product; rather, it is sufficient if the public assumes that the product comes from a single though anonymous, source. *Union Carbide Corp. v. Ever-Ready, Inc., et al.,* 531 F.2d 366 (7th Cir. 1976), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *see also Miller Brewing Company v. Falstaff Brewing Corporation, (supra)* 503 F.Supp. at 904; *see generally* J. Gilson, *(supra)* § 1.03; E. Vandenburgh, *Trademark Litigation and Procedure,* § 4.71 at 120 and § 1.23 at 34–36 (2d ed. 1968).

■ Therefore as a matter of law the capacity of the PPC "Rebel" or the "General Lee" cars to indicate the "Dukes of Hazzard" television show establishes the existence of secondary meaning in this case inasmuch as the toy cars are associated with a single source—the television series sponsored by Warner Bros. This follows even though Warner Bros., Inc. is not a manufacturer of toy cars. *See e.g., Boston Pro. Hockey Assn. v. Dallas Cap and Emblem Mfg., Inc.,* 510 F.2d 1004, 1012 (5th Cir. 1975), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98, *reh. denied,* 423 U.S. 991, 96 S.Ct. 408, 46 L.Ed.2d 98 (1975) (discussed *infra*).[5]

It should be noted that *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2nd Cir. 1981), which was decided subsequent to the district court's judgment herein, is practically on all fours with the instant case and serves as additional authority for deciding the instant appeal. The *Gay Toys* case involved an infringement suit by Warner Bros., Inc., against a manufacturer of the so-called "Dixie Racer" toy cars, which were virtually identical to the toy cars here under consideration. Warner Bros. presented a survey in that case which showed that eight of ten children questioned responded immediately to the "Dixie Racer" as the "General Lee" or the "Dukes of Hazzard" car and introduced affidavits confirming that retailers sold the "Dixie Racer" as the "Dukes of Hazzard" car. The Second Circuit noted that the district court properly inferred that "many children buy the car (or induce their parents to buy it for them) as a prop for play in which they pretend that they are 'the Duke Boys' of television fame" (*Id.* at 79). Despite such evidence the district court denied the motion for preliminary injunction brought by Warner Bros. on the ground that there could be no proof of confusion because Warner Bros. was not in the business of manufacturing toy cars and the purchasers of the "Dixie Racer" were not concerned with who manufactured the toy, or whether its manufacture was sponsored by the producer of the television series. (*Id.* at 78, 79). However, the appellate court concluded that "many of the consumers did confuse the 'Dixie Racer' with the 'General Lee' and assumed that the car was sponsored by Warner Bros.," which in the court's view was sufficient to invoke the protection of the court. (*Id.* at 79).

■ PPC objects to the Second Circuit's holding in *Gay Toys* for the same reason that it challenges the district court's decision in the present action, claiming that the court failed to apply the secondary

---

5. PPC's reliance upon *Ideal Toy Corp. v. Kenner Products, Inc.,* 443 F.Supp. 291 (S.D.N.Y. 1977) is misplaced inasmuch as the holding in that case—that the mere use of a similar "theme" does not cause confusion—was predicated upon a specific finding that the toys there under consideration were not copies of the characters appearing in the "Star Wars" movie. Here it is undisputed that PPC's toy cars are virtually identical to the "General Lee." PPC's argument that it was merely employing a southern race car theme in the design of its "Rebel" cars is wholly unpersuasive.

meaning test.[6] Along the same line, PPC maintains that the conclusion drawn by that court, that many of the customers "assumed that the car was sponsored by Warner Bros.," was unsupported by the facts. It is granted that the Second Circuit may have overstated the case by finding that consumers assumed that the toy cars were sponsored specifically by Warner Bros. rather than by the sponsor of the television series in general; nonetheless it is clear from the entire context of that opinion that a consideration of the issue of secondary association entered into the Second Circuit's decision.[7]

Finally, PPC urges that the Warner Bros.' survey failed to interview the appropriate consumer groups since it was limited to children between the ages of 6 to 12 rather than being focused upon the upper teenage group, parents, and grandparents who would presumably also purchase the toy cars. From this, PPC concludes that the percentages of actual consumers who would be confused as to the sponsorship of the product would be "significantly less" than that indicated by the Warner Bros. survey.

The question of likelihood of confusion is subject to the clearly erroneous rule. The district court's findings as to a likelihood of confusion are factual and are not to be overturned unless clearly erroneous. *Boston Pro. Hockey Assn., supra,* 510 F.2d at 1012; *Union Carbide, supra,* 531 F.2d at 383. The Lanham Act is silent as to the number of persons who must likely be confused for liability under 43(a). As a result, the range of numbers accepted by the courts in different cases has varied widely. *See* J. Gilson, *supra,* § 5.01 at 5–12. PPC's assertion that the percentage of consumers confused in this case would be "significantly less" than that claimed by Warner Bros. does not demonstrate that the court below clearly erred in accepting the survey findings as probative on the issue of the likelihood of confusion.

Another important factor bearing on the likelihood of confusion issue is PPC's admission that it deliberately copied the "General Lee" car to capitalize on the popularity of the TV show. In instances of intentional copying the second comer is generally presumed to have intended to create a confusing similarity of appearance and to have succeeded at doing so. *Perfect Fit Industries v. Acme Quilting Company,* 618 F.2d 950, 954 (2nd Cir. 1980), 646 F.2d 880 (2nd Cir. 1981); *Universal City Studios, Inc. v. Montgomery Ward & Company,* 207 U.S. P.Q. 852, 857 (N.D.Ill.1980); *see generally,* J. Gilson, *supra,* § 5.05[7]. But see *Toho Co., Ltd. v. Sears, Roebuck & Co.,* 645 F.2d 788, 791 (9th Cir. 1981). In *Boston Professional Hockey Assn., supra,* 510 F.2d 1004, a

---

**6.** In addition, PPC attempts to distinguish *Gay Toys* on procedural grounds. PPC claims that unlike the present case there was no contested evidentiary hearing or extensive factual inquiry involved in the Second Circuit case but rather, the district court merely dissolved a temporary injunction upon a very short record following brief arguments. Inasmuch as the alleged brevity of the district court's inquiry is not evident from the opinions rendered in either the district or appellate courts, it would not be appropriate for this Court to give weight to the representations of PPC regarding the course of events in that case. Besides, the factual findings and inferences drawn by the Second Circuit in *Gay Toys* are essentially the same as those made independently by the district court in the present case. PPC presents no substantial challenge to those factual findings. Moreover, PPC's objection to the alleged brevity of the record in the Second Circuit case seems immaterial insofar as the PPC does not contend that the factual findings in that case would

have been different had the Southern District developed a more extensive factual record.

**7.** A finding of secondary meaning is implicit in the Court's discussion of the principles of law applicable to that case:

Section 43(a) has been held to encompass a broad spectrum of marks, symbols, design elements and characters which the public directly associates with the plaintiff or its product. *Perfect Fit Industries Inc. v. Acme Quilting Co.,* 618 F.2d 950 (2nd Cir. 1980), and *Dallas Cowboys Cheerleaders Inc. v. Pussycat Cinema Ltd.,* 604 F.2d 200 (2nd Cir. 1979). This protection has been held to extend to the specific ingredients of a successful T.V. series. *D.C. Comics Inc. v. Filmation Associates Inc.,* 486 F.Supp. 1273, 1277 (S.D. N.Y.1980). Therefore, it is clear that the 'General Lee symbols' fall within the ambit of Section 43(a).

suit by an association of hockey teams to enjoin the unauthorized manufacture and sale of emblems displaying the teams' symbols, the defendant argued as does PPC here that the mere imitation of the product cannot constitute a false designation of origin or a false representation under 43(a). The Fifth Circuit Court, in holding that confusion was self-evident from the nature of defendant's use of plaintiff's marks, responded to the defendant's argument as follows:

> defendant did not merely copy a product of the Toronto team. Defendant reproduced Toronto's common law mark on embroidered emblems with the intent that the public recognize and purchase the emblems as the symbol of the Toronto team. In the language of § 1125, defendant used a symbol, Toronto's mark, which tended falsely to represent goods, the embroidered emblems, in commerce. Where the consuming public had the certain knowledge that the source and origin of the trademark symbol was in the Toronto team, the reproduction of that symbol by defendant constituted a violation of § 1125.

(*Boston Professional Hockey Assn., supra*, at 1012).

■ PPC did not introduce evidence to rebut the inference that its intentional copying of the "General Lee" car effectively created confusion on the part of the consuming public. Therefore PPC has not shown that a clear abuse of discretion resulted from the district court's granting of a preliminary injunction in this case.

■ Finally, PPC argues that Warner Bros. has failed to show irreparable injury, lack of adequate remedy at law and that the balance of hardships tips in its favor. This and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law. *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1024 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Tefal, S. A. v. Prod-*

*ucts International Company*, 185 U.S.P.Q. 545, 548 (D.C. 1975), *aff'd*, 529 F.2d 495 (3rd Cir. 1976). As this Court recently explained in *Ideal Industries (supra)*, this readiness to find irreparable injury arises in part from the realization that "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." quoting 4 R. Calmann "Unfair Competition, Trademarks and Monopolies," section 88.3(b) at 205 (3rd ed. 1970).

■ The likelihood of confusion caused by PPC's manufacture of "Rebel" cars could vitiate Warner Bros.' entire licensing program and damage the good will associated with Warner Bros.' television series. It is apparent that such damage cannot be measured in monetary terms. For this reason we reject PPC's objection that "there was no showing that PPC's toys in any way have damaged Warner Bros.' good will or damaged its licensing program in such a way that it could not be compensated by money damages." We note that despite its protestation PPC does not offer a suggestion as to how such damages may be calculated.

■ Although the district court did not explicitly address the question of the relative hardship to the parties of a preliminary injunction in this case, it does not appear that the district court abused its discretion in granting the preliminary injunction. It is interesting to note that the district court expressed some skepticism regarding PPC's claim that it stood to lose approximately one million dollars in sales by the issuance of an injunction. In open court the district court denied the request of bond of one million dollars as excessive, noting that PPC's "figures had been pretty much speculative" and that the mold for the "Rebel" car is a long-term piece of equipment that could be reused for making toy cars without

the offending design elements.[8] In view of the district court's express reservations concerning the evidence that PPC presented regarding the financial hardship that it would suffer in the event that an injunction issued against the manufacture of "Rebel" cars, the district court cannot be seen as having abused its discretion in granting the preliminary injunction to Warner Bros. and thereby implicitly finding that the balance of hardships weighed in its favor. Besides, PPC cannot now complain that having to mend its ways will be too expensive. *Ideal Industries, Inc., (supra)* 612 F.2d at 1027.

In view of the foregoing it has not been necessary to address the alternative theories of recovery advanced by Warner Bros., Inc. The order of the district court granting the preliminary injunction in this case is affirmed.

---

**8.** The district court noted that Mr. Bergman, the vice president of PPC, testified that he really didn't know what the approximate gross revenues were for orders that had been taken as of that time and that the only figures that Bergman was able to supply were calculated upon the sale prices of the cars. Mr. Bergman calculated that thus far that year PPC sales figures were around $400,000 for the small Maverick Rebel car and $162,000 for the Dodge Charger. As for the rest of the year's total anticipated earnings, Mr. Bergman opined: "I think it would be over—well over a million dollars in sales for these two items."