**BOSTON ATHLETIC ASSOCIATION, et al., Plaintiffs, Appellants,**

v.

**Mark SULLIVAN, etc., et al., Defendants, Appellees.**

No. 88–1352.

United States Court of Appeals, First Circuit.

Heard Sept. 16, 1988.

Decided Jan. 27, 1989.

As Amended Jan. 31, 1989.

George C. Caner, Jr., with whom John W. Van Lonkhuyzen and Ropes & Gray, Boston, Mass., were on brief, for plaintiffs, appellants.

Stephen M. Trattner, Washington, D.C., Philip W. Tone, Jenner & Block, Lee N. Abrams, and Mayer, Brown & Platt, Chicago, Ill., on brief for U.S. Golf Ass'n, amicus curiae.

Glenn M. Shriberg, Boston, Mass., with whom Dana Ryan Turnbull, Arlington, Mass., and Shriberg & Sorbello, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES and SELYA, Circuit Judges.

BOWNES, Circuit Judge.

In this service mark infringement case,[1] Boston Athletic Association (BAA) and Image Impact, Inc. (Image) appeal the denial of their motion for summary judgment and the concurrent granting of the defendants', Mark Sullivan d/b/a Good Life (Sullivan) and Beau Tease, Inc. (Beau Tease), motion for summary judgment. This case arises out of the sale by the defendants of T-shirts (hereinafter called shirts) and other wearing apparel with designs alleged to infringe on BAA's service marks "Boston Marathon," "BAA Marathon" and its unicorn logo. We agree with the district court that there are no genuine issues of material fact, but disagree with the district court's determination of which side was

---

1. Service marks and trademarks are similar yet distinct creatures. A trademark is used to distinguish one's goods from those made by others, while a service mark is used to distinguish one's services from those offered by others. In either case the marks are used to indicate the distinctive source of the goods or services, even if that source is unknown. *See Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815 n. 1 (1st Cir.1987). For the purposes of this case, the distinction between the two types of marks is irrelevant; thus, cases discussing either apply. The services here are the operation and sponsorship of the Boston Marathon by BAA.

entitled to summary judgment. We, therefore, reverse.

## I. THE STARTING LINE

The standard for granting summary judgment in a trademark infringement case is as follows:

> Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Astra [Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.]*, 718 F.2d [1201] at 1204 (1st Cir. 1983); *Pignons [S.A. de Mecanique de Precision v. Polaroid Corp.]*, 657 F.2d [482] at 486 (1st Cir.1981); Fed.R.Civ.P. 56(c). A factual dispute is material if it "affects the outcome of the litigation," and genuine if manifested by "substantial" evidence "going beyond the allegations of the complaint." *Astra*, 718 F.2d at 1204 and *Pignons*, 657 F.2d at 486; *quoting Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

*Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 815 (1st Cir.1987); *see also Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1204 (1st Cir.1983); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir.1981). "While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so." *Kazmaier v. Wooten*, 761 F.2d 46, 48–49 (1st Cir.1985) (citations omitted). "In passing on a summary judgment motion, the court must view the record and draw inferences in the light most favorable to the opposing party." *Id.* (citations omitted). Because we believe summary judgment should have been entered for plaintiffs, we review the facts in the light most favorable to defendants.

■ Before we turn to the facts, however, we must deal with a preliminary matter. As discussed *infra* at 26, prior to the parties submitting cross-motions for summary judgment, the district court conducted an aborted trial at which the plaintiffs presented the majority of their case. The use of the trial record was urged by the parties in their cross-motions: the plaintiffs referred to the exhibits, while the defendants referred to both the testimony and the exhibits. Although the district judge did not explicitly address the point in his memorandum of decision, he did state that he had "[r]eview[ed] the entire file" in reaching his decision on the cross-motions for summary judgment. We assume that this review included the testimony and exhibits received in the aborted trial. Reference to prior trial testimony and exhibits is proper in summary judgment cases. *Advance Financial Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 27 (1st Cir.1984). We have treated the trial record as part of the record before us.

## II. THE START IN STATE COURT

We have taken the facts mainly from the district court opinions. BAA is a charitable organization whose principal activity has been conducting the Boston Marathon since it was first run in 1897. The race is run annually from Hopkinton to Boston on Patriots' Day, the third Monday in April. In recent years, a day or two prior to the race an exposition has been put on by Conventures, Inc. under BAA's sponsorship. At the exposition, various businesses set up booths and sell shirts, running apparel, and sports items. The registered runners also pick up their numbers and official materials from the BAA booth.

Defendant Sullivan, a resident of Hopkinton, Massachusetts, retails wearing apparel under the name "Good Life" at a store in Hopkinton. Defendant Beau Tease, Inc. is a Massachusetts corporation doing business in Cambridge. It imprints and distributes merchandise, including shirts, to the trade.

In an effort to defray the costs of the race, BAA began an active campaign to market its name via licensing agreements. It registered the names "Boston Mara-

thon" and "BAA Marathon" and its unicorn logo in Massachusetts in 1983 and "Boston Marathon" in the United States Patent and Trademark Office in 1985.

As early as 1978, the defendants were imprinting and selling shirts with the name "Boston Marathon" and various other terms including the year on them. In 1984, defendant Sullivan negotiated an agreement under which Beau Tease sold to BAA a large quantity of shirts which BAA gave away to the athletes and volunteers during the 1985 race. In 1986, Image, through its President, Mickey Lawrence, entered into an exclusive license with BAA for the use of BAA's service marks on wearing apparel including shirts. Starting in 1986, Image and BAA gave notice to imprinters, wholesalers, and retailers that Image was the exclusive licensee of the BAA and that any unauthorized use on merchandise of the name "Boston Marathon," or a similar name or a colorable imitation thereof, would violate the exclusive rights of BAA and its licensee.

By March of 1986, Beau Tease was imprinting and Sullivan was selling in the Boston area shirts imprinted as follows:

1986 Marathon

[picture of runners]

Hopkinton–Boston

BAA brought suit in Massachusetts Superior Court against the current defendants, and others, alleging that the above design infringed upon its marks. The superior court denied its request for a preliminary injunction, *Boston Athletic Association v. Graphtex, Inc.*, Suffolk Superior Court No. 82365, slip op. (April 11, 1986); the denial was affirmed by a single justice of the Massachusetts Court of Appeals, No. A.C.–86–0169–CV (April 18, 1986) (Fine, J.). The action was discontinued without prejudice; the parties reserved their right to assert their positions in any future action.

In late 1986 and early 1987, Beau Tease began to imprint and Sullivan began to retail shirts and other apparel imprinted as follows:

1987 Marathon

[picture of runners]

Hopkinton–Boston

The 1987 shirts and the 1986 shirts were of poorer quality than plaintiffs' both as to manufacture and materials. The defendants were planning to sell their shirts and other items at the exposition.

### III. THE CONTESTANTS REACH FEDERAL COURT

In 1987, the exposition was held on Saturday April 18 and the race on Monday April 20. On April 1, 1987, BAA and Image filed suit in the United States District Court for the District of Massachusetts alleging that defendants' 1986 and 1987 shirts, with the logos described above, infringed BAA's marks. The complaint alleged confusion in violation of the Lanham Act, 15 U.S.C. § 1114, and a similar provision in Massachusetts law, Mass.Gen.Laws Ann. ch. 110B, § 11. The complaint also included additional state law counts for dilution, Mass.Gen.Laws Ann. ch. 110B, § 12, sale of counterfeits and imitations, Mass. Gen.Laws Ann. ch. 110B, § 13, and unauthorized use of a name, Mass.Gen.Laws Ann. ch. 214, § 3A. Along with the complaint, plaintiffs filed a motion for a preliminary injunction, seeking to stop the manufacture and sale of any article bearing the name "Boston Marathon" or any similar name.

On April 8, 1987, the district court held a hearing at which it consolidated the preliminary injunction hearing with a trial on the merits; the defendants were deemed to have made a general denial. Prior to the trial, the parties agreed to certain facts including BAA's registration of its marks in 1983 and 1985. Also prior to trial, several affidavits were filed with the court.

Three days of trial were held on April 13, 14, and 15. During the trial, the plaintiffs presented most of their case. Lawrence, president of plaintiff Image, testified to instances in which people bought defendants' shirts at the 1986 exposition thinking they were plaintiffs'. This testimony was admitted over objection. On April 16, be-

cause the exposition was only two days away and the parties were concerned about whether the defendants could sell their shirts at the exposition, the district court received offers of proof as to the remaining witnesses and heard oral argument on the motion for a preliminary injunction.

In a bench opinion the court found that plaintiffs would probably succeed in showing that: 1. BAA's mark was valid and effective at all relevant times; 2. the name "Boston Marathon" when used on products would cause the average person to infer sponsorship by somebody, even if the average person did not realize that BAA was the sponsor; 3. defendants' designs referred to the Boston Marathon; 4. plaintiffs' shirts were of a higher quality than defendants'; and 5. people who attend the exposition, given their interest in running, would infer sponsorship by BAA of Beau Tease's shirts sold at the exposition. The court also found that sale of the same shirts in any other milieu, such as along the race course, would not cause an average person to infer sponsorship by BAA. Based on these findings, the court did not enjoin Sullivan in any way, but did preliminarily enjoin Beau Tease from selling shirts directly at the exposition or marketing to anyone who it knew would sell Beau Tease's 1987 shirts at the exposition.

On April 17, BAA appealed and moved for an injunction in this court. That same day, we denied the injunction because of a lack of irreparable harm. We noted that trademark infringement ordinarily causes intangible injuries which make injunctive relief appropriate. We felt, however, that such relief was not suitable in this case because of the annual and discrete nature of the harm, the availability of a damages remedy and the late date at which plaintiffs' instituted suit in federal court. On April 28, the appeal was dismissed on motion by the plaintiffs.

When the case returned to district court, the parties submitted cross-motions for summary judgment. The motions were bolstered by affidavits—some had been filed pretrial and some filed with the motions—and by references to the trial materials. Plaintiff Image's affidavit, executed by Lawrence, included instances of people buying defendants' 1987 shirts believing them to be plaintiffs'. Lawrence Newman, press liaison for BAA, submitted along with a second affidavit a series of newspaper articles and summaries of the articles, referring to the Boston Marathon and BAA for every tenth year from 1897 to 1967 and for every year from 1972 to 1983 and for 1986 and 1987. On July 24, plaintiffs moved to amend their complaint to include a declaratory judgment claim with respect to their rights in the name "Boston Marathon." The motion also asked that their claim be broadened to include an injunction against defendants' design, already described, with any year on it. The district court allowed this motion on August 17, 1987.

On February 4, 1988, plaintiffs moved to amend their complaint further by including defendants' 1988 shirts and a design:

Boston

[picture of runner/s]

19xx

Plaintiffs also sought a preliminary injunction. On March 7, the district court rendered its decision. On March 11, the district court found the preliminary injunction request moot in light of its March 7 decision. It stated that it had considered the plaintiffs' motion relative to the 1988 shirts and that the March 7 opinion applied to those shirts as well.

The district court's March 7 decision found that BAA's marks were its most valuable asset and were at all relevant times valid and enforceable. It found that an average person would infer sponsorship by someone of a product carrying the logo "Boston Marathon," and that defendants' logos referred to the marathon. The court stated that there was a dispute whether the public would associate BAA with the Boston Marathon but that this dispute was not material. It held that the public would not infer that the defendants' logos were sponsored by BAA. The court explicitly disregarded Lawrence's affidavit evidence of

confusion because it was hearsay and the court found no other evidence that any "disinterested" person was confused as to the source of defendants' shirts. The court also held that BAA's rights did not extend beyond the use of its exact service marks. The court ruled as a matter of law that there was no confusion between the defendants' and plaintiffs' shirts. The court concluded its opinion: "More precisely, this Court rules that the specific T-shirt logo challenged in this action does not, as a matter of law, give rise to any colorable confusion with products authorized by the BAA as part of its sponsorship of the particular road race in question." Judgment for the defendants was entered and the preliminary injunction was dissolved. This appeal followed.

## IV. BAA'S RIGHT TO RUN

Defendants argue that they should prevail because BAA's marks are entitled to no protection for two reasons: 1. "Boston Marathon" has become a generic term inasmuch as it now refers to both the race and the services rendered by BAA; and 2. defendants' use of "Boston Marathon" on shirts from 1978 constitutes a prior usage.

With respect to genericness, defendants rely on *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296 (9th Cir. 1979), *appeal after remand*, 684 F.2d 1316 (1982), *cert. denied sub nom. CPG Products Corp. v. Anti–Monopoly, Inc.*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). In its first opinion, the Ninth Circuit concluded its summary of the law of genericness by stating that "when members of the consuming public use a game name to denote the game itself, and not its producer, the trademark is generic and, therefore, invalid." 611 F.2d at 304 (footnote omitted). In its second opinion, the court relied heavily on a survey, which measured the motive of purchasers in selecting a "Monopoly" game, in deciding that "Monopoly" was a generic term. 684 F.2d at 1324–1326. These holdings, however, were subsequently nullified by Congress. In 1984, Congress amended § 14(c) of the Lanham Act, 15 U.S.C. § 1064(c), specifically because of the Ninth Circuit case. *See* S.Rep. No 627, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 5708, 5718–5728. The amendment added the following to the section:

> A registered mark shall not be deemed to be the common descriptive name of goods or services [*i.e.* a generic] solely because such mark is also used as a name of or to identify a unique product or service. The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the common descriptive name of goods or services in connection with which it has been used[.]

The burden of proof is on the party seeking to have a registered mark declared a generic to show that it has become so under the above test. 3 R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 18.25 at 231 (L. Altman 4th ed. 1983) (hereinafter _ Callan § _). Here, the defendants have introduced no evidence on the issue of "primary significance" and thus, have failed to meet the burden of proof.

With respect to prior usage, it is axiomatic that "registration does not create the underlying right in a trademark. That right, which accrues from the use of a particular name or symbol, is essentially a common law property right...." *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir.1980); *see also Volkswagenwerk*, 814 F.2d at 815–816 (quoting *Keebler*). Therefore, BAA's failure to register its marks until the mid–1980s is not dispositive. Furthermore, a mark provides protection not only for the product or service to which it is originally applied but also to related items or services. *See* 3 Callman § 19.23.

Here, the uncontradicted evidence, consisting mainly of media references[2] to "Boston Marathon."

---

**2.** The evidence also included videotapes of the race showing the names "BAA Marathon" and

the race, especially newspaper and magazine articles, shows that: 1. the race was originally called the Boston Athletic Association or Boston A.A. Marathon; 2. since 1917, the race has also been called the Boston Marathon; and 3. since at least 1977, a year before defendants' "prior usage," BAA used the names "B.A.A. Marathon" and "Boston Marathon" interchangeably.[3] This use by BAA undercuts defendants' prior use claim as to the words *per se*. As for the use of the words on shirts and other running apparel, such apparel is related to the service provided by BAA, the race, and BAA is entitled to enjoin use of its marks on such items. *Cf. Volkswagenwerk*, 814 F.2d 812 (holder of trademark for "Beetle" with respect to car sales entitled to enjoin defendant's use of the same name with respect to car repairs). We agree with the district court that BAA has had valid and enforceable marks for the entire relevant time frame.

## V. THE LONGEST STRETCH: LIKELIHOOD OF CONFUSION

Having held that BAA has enforceable rights in its marks, we turn to the central issue in this and most infringement cases: the likelihood of confusion. Claims for infringement of a registered trademark are governed by § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1),[4] which provides, in pertinent part:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion or to cause mistake, or to deceive;* ...

. . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

(Emphasis added.)

In order to determine whether defendants' shirts are "likely to cause confusion ...," we must first ask, "confusion as to *what*?" In the "typical" trademark infringement case, the "likelihood of confusion" inquiry centers on whether members of the purchasing public are likely to mistake defendants' products or services for plaintiffs' protected products or services within the same category. *See e.g., Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482 (1st Cir.1981) (cameras); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366 (1st Cir.1980) (crackers); *President and Trustees of Colby College v. Colby College–New Hampshire*, 508 F.2d 804 (1st Cir.1975) (colleges). One question before us is whether members of the purchasing public are likely to mistake defendants' T-shirts for those of plaintiffs. This was the main issue that was addressed and decided below.

There is, however, a distinct but inseparably related issue, not adverted to directly below, that is involved in this case. Defendants are using the Boston Marathon sponsored and operated by the BAA to promote the sale of goods which are adorned so as to capitalize on the race. This implicates what is called a "promotional goods" issue. *See generally*, 2 T.J. McCarthy, *Trademarks and Unfair Competition* § 24:3 (2d ed. 1984); Denicola, *Institutional Publicity Rights: An Analysis of the Merchandising of Famous Trade Symbols*, 62 N.Car.L.Rev. 603 (1984); Note, *Promotional Goods and the Functionality Doctrine: An Economic Model of Trademarks*, 63 Tex.L.Rev. 639 (1984). Under this issue, the "likelihood of confusion" inquiry focuses upon whether the purchasing public is likely to believe that the sponsor of the Boston Marathon pro-

**3.** *See, e.g.,* BAA 1977 Souvenir Booklet, part of ex. 68.

**4.** Likelihood of confusion is also an essential element under Mass.Gen.Laws Ann. ch. 110B, § 11, the state's trademark infringement statute.

Because trademark infringement is defined in essentially the same terms under both the Lanham Act and state law, we will direct our discussion only to the former.

duces, licenses, or otherwise endorses defendants' shirts.

We start with the matter decided below, "confusion of goods." Many of our findings and rulings also bear on the related issue of "promotional goods." [5]

### A. Confusion of Goods

The First Circuit has identified eight factors to be weighed in assessing likelihood of confusion.

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. *Astra*, 718 F.2d at 1205; *Pignons*, 657 F.2d at 487. Examining the evidence favorable as it applies to [defendants], we must determine on the whole whether there is any genuine issue as to likelihood of confusion. No one factor is necessarily determinative, but each must be considered. *Astra*, 718 F.2d at 1205; *Pignons*, 657 F.2d at 487–92.

*Volkswagenwerk*, 814 F.2d at 817; *see also Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 559 (1st Cir.1982) (likelihood of confusion is "[t]he key element in any infringement action"); *Pignons*, 657 F.2d at 486–487 (likelihood of confusion is an element under both Massachusetts and federal law).

### 1. Similarity of the Marks

" '[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of the individual features.' *Pignons*, 657 F.2d at 487 (omitting

citations)." *Volkswagenwerk*, 814 F.2d at 817. Meaning alone, without reference to appearance and sound, may be sufficiently close to constitute similarity. *See* 3A Callman § 20.18.[6]

■ It is evident that defendants' logos refer specifically to the "Boston Marathon." There is but one Boston marathon race; defendants' logos use the term "Marathon" and depicts runners. It is run annually; defendants' logos refer to a specific year implying an annual event. The race begins at Hopkinton and ends in Boston; defendants' logos include these cities. Despite this, defendants have introduced no evidence showing that they have taken steps to turn their similarly marked products into dissimilar ones by clearly distinguishing their products, and their lack of BAA sponsorship, from those sold by plaintiffs. When one uses a mark similar to one already in use, there is generally an affirmative duty to avoid the likelihood of confusion. *Volkswagenwerk*, 814 F.2d at 817–818; *see Astra*, 718 F.2d at 1205 (even where defendant clearly marked its product with its company name, similarity might be found); *Pignons*, 657 F.2d at 487 (use of manufacturer's name and distinctive packaging undercut similarity claim); *cf. Leathersmith of London, Ltd., v. Alleyn*, 695 F.2d 27, 29–30 (1st Cir.1982) (similar term was used only in conjunction with the defendant's company name and then, only descriptively), *cert. denied*, 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983); *President and Trustees of Colby College v. Colby College–N.H.*, 508 F.2d 804 (infringement found despite defendant's use of state name to eliminate confusion).

The district court's holding that plaintiffs' rights did not sweep any further than

---

**5.** Chief Judge Campbell questions whether plaintiffs have made a sufficient showing to prevail on summary judgment on the basis of the "confusion of goods" approach, pages 29–32, *infra*. He believes that there remains a question of material fact, on this analysis, whether prospective purchasers would be likely to confuse defendants' T-shirts with plaintiffs'. He does not agree, therefore, with the full extent of the court's analysis on pages 29–32, *infra*. Judge Campbell believes that the more appropriate approach is the "promotional goods" analysis

set out on pages 32–35, *infra*, of the court's opinion, in which he joins.

**6.** One of plaintiffs' shirts, ex. 25, has imprinted on it an artistic representation of the race course from Hopkinton to Boston, is entitled "The Boston Marathon" in large yellow letters, and contains depictions of runners along the course. Though not identical, plaintiffs' and defendants' shirts carry a similar message.

their actual marks is not a correct application of trademark law. Such a rule would eviscerate trademark law because "few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Baker v. Master Printers Union of New Jersey*, 34 F.Supp. 808, 811 (D.N.J. 1940).

Here, the meaning of the two marks is more than similar, it is identical. This overcomes any difference in appearance between them.

### 2. Similarity of the Goods

The parties offer virtually the same goods: shirts and other wearing apparel. Thus, "[u]nder this factor, there is a strong likelihood of confusion." *Volkswagenwerk*, 814 F.2d at 818; *compare id.* (both parties were in the business of automobile sales and service) *with Astra*, 718 F.2d at 1205–1206 (plaintiff sold a local anesthetic while defendant sold a blood analyzer) *and Pignons*, 657 F.2d at 487–488 (plaintiff sold an expensive, high quality camera while defendant sold a relatively inexpensive instant camera).

### 3. Relationship Between the Parties' Channel of Trade

### 4. Relationship Between the Parties' Advertising

### 5. Classes of Prospective Purchasers

As in some of our previous cases, we treat these three factors simultaneously. *See Volkswagenwerk*, 814 F.2d at 818.

The parties sell their shirts predominantly in Boston-area retail shops, at the exposition, and along the race course. Sales are largely seasonal, centering on the race date. The parties use the same general method of advertising: displays in store windows, in booths at the exposition, and along the race course. Prospective purchasers are drawn from the public at large. The shirts involved here retailed for about

$7–10 and were sometimes sold under hectic conditions. Inexpensive items, bought by the casual purchaser, are not likely to be bought with great care. "Courts have found less likelihood of confusion where goods are expensive and purchased after careful consideration." *Pignons*, 657 F.2d at 489; *see also* 3A Callman § 20.10 at 60.

The virtual identity between the parties' sales outlets and advertising methods, as well as the purchasing public's lack of opportunity to exercise discrimination in making such purchases, all point toward a likelihood of confusion.

Before we move to the sixth factor, we must first address the district court's initial division of the purchasing public into two classes. In fashioning its preliminary injunction, the court split the purchasing public into a class of those interested enough in racing to attend the exposition and all others. It found that only the former were likely to connect BAA with the Boston Marathon, and thus, were the only ones likely to infer sponsorship of defendants' products by BAA. In its summary judgment decision, the court stated that there was a genuine issue as to the public's knowledge of BAA's sponsorship of the Marathon but that this issue was not material because resolution of the issue would not alter the outcome.

Distinctions based on expertise can be useful in analyzing likelihood of confusion, *see, e.g., Astra*, 718 F.2d at 1206–1207; *Pignons*, 657 F.2d at 489, but we find no reason for such a distinction here. Unlike the sophisticated hospital personnel involved in *Astra* or the expert camera buffs in *Pignons*, it is the general public that is the market for shirts commemorating the Boston Marathon. In making its distinction, the court appears to have reasoned as follows: defendants' logos mean "Boston Marathon"; Boston Marathon shirts imply sponsorship by someone; the public (as opposed to those who attend the exposition) does not know that BAA sponsors the Marathon; therefore, the public cannot infer that BAA sponsors defendants' shirts.[7]

---

7. To the extent that the court's distinction was

based on the purchasing public's lack of knowl-

The key step in this reasoning—the public's lack of knowledge of BAA's sponsorship of the race—is not supported in the record. Indeed, the evidence is to the contrary. Plaintiffs submitted voluminous, uncontradicted evidence, in the form of numerous newspaper and magazine articles dating back to 1897, videotapes of television broadcasts, and encyclopedia entries, all showing that the public was continually exposed to the fact of BAA's sponsorship of the Boston Marathon. Defendants argue that the plaintiffs' evidence is not sufficient to show the public's knowledge because a public poll was not conducted. The lack of survey data, however, does not fatally undercut plaintiffs' claims. The defendants offered no evidence tending to contradict plaintiffs' assertions. Plaintiffs were not bound to a particular form of evidence. A poll might have been more accurate, but the lack of one does not nullify the evidence plaintiffs did introduce.

■ We find that no genuine issue of fact exists as to the public's general awareness of BAA's sponsorship of the Boston Marathon; there was, therefore, no reason to divide the purchasing public into two classes.

### 6. Evidence of Actual Confusion

Mickey Lawrence, president of Image Impact, reported in her affidavit that she had encountered a shopper at the Filene's department store who expressed surprise when Lawrence told her that defendants' shirt, which the shopper was wearing, was not an "official" Boston Marathon shirt. The district court refused to consider this account, holding that it was inadmissible hearsay. We think that the account was not hearsay, however, because it was not "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The statement was made not to prove that the defendants' shirts were in fact officially authorized, but rather to show that the declarant, a member of the public, *believed* that they were officially authorized.

Lawrence described two other instances where members of the public had bought defendants' shirts believing them to be officially sponsored shirts; one incident involved a 1986 shirt bought at the exposition, the other a 1987 shirt bought at the race.[8] She also described events occurring at her booth during the 1986 exposition:

People would come over after they had been shopping. They would get to our booth and they would say, oh, I think I like that T-shirt better. Can I exchange this one? And they would take out a [1986] ... shirt [sold by defendants].

. . . . .

And I would tell them or one of the salespeople would say, that isn't one of our shirts. You will have to return it where you bought it. And then there would be indignation of, well, it's a Boston Marathon shirt. Why can't I return it at the Boston Marathon booth? This happened many times to many of the people who were selling, all of the people that we had hired to do it. And it happened throughout the course of the race—of the expo.

While not as accurate as a survey might have been,[9] this evidence shows that some people were actually confused as to who

edge that the source of the shirts was Image, through its license, such knowledge is irrelevant. *See* 3A Callman § 21.07 at 25 ("indeed, the purchasing public does not normally know the source of the article. It suffices that the public normally assumes that articles bearing the same mark are from the same source.") In this case, the district court found, and we agree, that the public will infer sponsorship by some organization when it sees a Boston Marathon shirt. Thus, the public's lack of knowledge as to the exact identity of that source is irrelevant on this issue.

**8.** The fact that one of these incidents involved a client of Lawrence's does not make it less relevant; rather, it explains why the person went directly to Lawrence when he had a complaint about the shirt he bought.

**9.** Defendants make a similar argument regarding the lack of survey data with respect to actual confusion. For essentially the same reasons as already set forth in connection with the lack of a poll, we find it unpersuasive. We do not mean to imply that surveys are not a valuable method of showing actual confusion or sponsorship; we merely decline to require them as the only way of proving these factors.

sponsored defendants' shirts. This factor, then, weighs in favor of a likelihood of confusion.

### 7. Defendants' Intent in Adopting Their Marks

The facts can only be interpreted to mean that defendants sought to profit from BAA's sponsorship of the Boston Marathon. The defendants chose designs that obviously referred to the Marathon, put those designs on the same types of clothing sold by the plaintiffs, sold those shirts at the same time and in the same manner as the plaintiffs to the same general purchasing public. Defendants' actions clearly show their intent to trade on BAA's sponsorship and management of the Boston Marathon.

### 8. Strength of BAA's Mark

"The distinctiveness and reknown [sic] of a trademark determine its relative strength or weakness, which, in turn, defines the scope of protection to be accorded the mark against others which are confusingly similar." 3A Callman § 20.43 at 345 (footnote omitted). We have found the following factors useful in determining a trademark's relative strength: the length of time a mark has been used and the plaintiff's relative renown in its field, *Pignons*, 657 F.2d at 491; the strength of the mark in plaintiff's field of business, especially by looking at the number of similar registered marks, *Astra*, 718 F.2d at 1209; and the plaintiff's actions in promoting its mark, *Volkswagenwerk*, 814 at 819.

Here, although BAA has only relatively recently registered its marks, it used them for a long period of time before registration. The Boston Marathon is one of the oldest and most prestigious marathons in this country. BAA, as a charitable organization, does not have the same impetus to advertise that a for-profit company would have. Nonetheless, its broad media exposure serves a similar purpose; it makes known to the public the BAA's sponsorship of the Boston Marathon. Finally, no evidence was introduced that others have obtained, or have not been able to obtain, registration of similar marks in the United States Patent and Trademark Office or its Massachusetts counterpart. *Compare Astra*, 718 F.2d at 1209 (plaintiff or its parent company held all five federal trademarks using "ASTRA" in the health products field, and thus, had "a certain degree of strength").

The "strength" factors militate in favor of a finding that the mark held by BAA in "Boston Marathon" is a strong one. Therefore, broad protection of the mark is warranted.

Based on the undisputed facts and the pertinent law, plaintiffs have proved that the purchasing public are likely to confuse defendants' shirts with those of plaintiffs.

### B. The Promotional Goods Issue

The question here is whether the purchasing public is likely to believe that the sponsor of the Boston Marathon, produces, licenses or endorses defendants' shirts. Whether or not purchasers happen to know that the sponsor of the Boston Marathan is an organization called the "Boston Athletic Association" is irrelevant to this "likelihood of confusion" analysis. *See* 15 U.S.C. § 1127, as amended (defining "service mark" as a mark "indicat[ing] the source of the services, even if that source is unknown"). *Cf.* 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 15:2, at 663–64 (2d ed. 1984). In order to establish infringement in a promotional goods case, it has traditionally been the plaintiff's burden to show that prospective purchasers are in fact likely to be confused or misled into thinking that the defendant's product was produced, licensed, or otherwise sponsored by the plaintiff. *See e.g., Supreme Assembly v. J.H. Ray Jewelry Co.,* 676 F.2d 1079, 1082 (5th Cir.1982); *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 919 (9th Cir. 1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981); *University of Pittsburgh v. Champion Products, Inc.,* 566 F.Supp. 711 (W.D.Pa.1984); *NFL Football Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651 (W.D. Wash.1982).

The facts bearing on this type of confusion have been, to a great extent, already set forth in our "confusion of goods" analysis. We therefore only summarize them here. The applicable law is, however, discussed *in extenso*.

There can be no doubt that the language and design on defendant's shirts intentionally calls attention to an event that has long been sponsored and supported by the BAA—an event that is, in fact, the subject of its registered mark. Defendants' shirts are clearly designed to take advantage of the Boston Marathon and to benefit from the good will associated with its promotion by plaintiffs. Defendants thus obtain a "free ride" at plaintiffs' expense. In the oft quoted words of the Supreme Court in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), because the Boston Marathon has achieved its renown as a result of BAA's "expenditure of labor, skill, and money," such unlicensed use of BAA's mark would permit defendants to "reap where [they have] not sown." *Id.* at 239, 39 S.Ct. at 72. Like Rosie Ruiz, a notorious imposter in the 1980 Boston Marathon, defendants would be given a medal without having run the course.

Under these facts, the plaintiffs have to prove, of course, that the defendants are trading on plaintiffs' mark and good will. We do not think, however, that plaintiffs also have to prove that members of the public will actually conclude that defendants' product was *officially* sponsored by the Marathon's sponsor (whoever that sponsor may be). One difficulty with presenting such proof is that few people, other than legal specialists, could venture an informed opinion on whether someone using the logo of the sponsor of a sporting event is required to have the permission of the event's sponsor. Lacking such knowledge, the question of approval is pure guesswork. To ask a factfinder to determine whether the public would think that

defendants' shirts were "authorized" or "official" shirts is to ask it to resolve a confusing and, in many contexts, virtually meaningless question. Asking a factfinder to make such a determination also raises a problem of circularity:

> If consumers think that most uses of a trademark require authorization, then in fact they will require authorization because the owner can enjoin consumer confusion caused by unpermitted uses or charge for licenses. And if owners can sue to stop unauthorized uses, then only authorized uses will be seen by consumers, creating or reinforcing the perception that authorization is necessary. This is a "chicken and the egg" conundrum.

2 J.T. McCarthy, *Trademarks and Unfair Competition* § 24:3, at 170 (2d ed. 1984).

The pertinent case law recognizes the difficulty of asking factfinders to decide whether particular uses are "authorized". The Fifth Circuit has held that a factual showing of confusion about source or sponsorship need not be made in order to enjoin a manufacturer of cloth emblems from the unlicensed sale of National Hockey League team emblems. The court held:

> The confusion or deceit requirement [of 15 U.S.C. § 1114] is met by the fact that the defendant duplicated the protected trademarks and sold them to the public knowing that the public would identify them as being the teams' trademarks. The certain knowledge of the buyer that the source and origin of the *trademark symbols* were in plaintiffs satisfies the requirement of the act.

*Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir.) (emphasis added), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed. 2d 98 (1975).[10] More recently, the Eleventh Circuit affirmed an injunction against the sale of "Battlin' Bulldog Beer," with cans emblazoned with the University of Geor-

---

**10.** We note, however, that since *Boston Professional Hockey,* the Fifth Circuit has reaffirmed the traditional view that the Lanham Act requires a showing of confusion as to source or sponsorship. *Supreme Assembly v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082 (5th Cir.1982); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir. 1977).

gia's canine mascot, in part on the ground that " 'confusion' may relate to the public's knowledge that the *trademark*, which is 'the triggering mechanism' for the sale of the products, originates with the plaintiff." *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir.1985) (citing *Boston Professional Hockey Ass'n*, 510 F.2d at 1012) (emphasis in original).

Other examples of such increased concern with a mark holder's rights can be found in decisions by both the Second and Seventh Circuits to enjoin toy manufacturers from the unlicensed manufacture and sale of toy cars. *Warner Bros. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir.1981), *decision on appeal after remand*, 724 F.2d 327 (2d Cir.1983); *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852 (7th Cir.1982). In each case plaintiff's evidence showed that children bought defendant's toy car (or prevailed on their parents to buy it for them) because they identified it with the "General Lee" car on plaintiff's "Dukes of Hazzard" television show. There was no probative evidence showing that the children or their parents were likely to believe that the television show's producers had authorized or licensed the toy. Nevertheless, the courts held that the evidence that purchasers recognized defendant's toy as plaintiff's "General Lee" car was sufficient to provide the required "likelihood of confusion." [11]

In *Gay Toys*, the Second Circuit moved quickly from the evidence of the purchasers' recognition of the car as the "General Lee" car to the inference that "many of the consumers did confuse the 'Dixie Racer' [defendant's toy car] with the 'General Lee' and assumed that the car was sponsored by Warner Bros." / 658 F.2d at 79. As the district court noted on remand, the Second Circuit's opinion seemed to "creat[e] a conclusive presumption that if children are reminded of the 'General Lee' by seeing a facsimile thereof, they will assume distribution of the facsimile to have been 'spon-

sored' by plaintiff." *Warner Bros. v. Gay Toys, Inc.*, 553 F.Supp. 1018, 1021 (S.D.N.Y.), *aff'd*, 724 F.2d 327 (2d Cir.1983). In *Processed Plastic*, the Seventh Circuit, in its opinion affirming an injunction against the toy manufacturer, emphasized the defendant's admission that it had *"deliberately* copied the 'General Lee' car to capitalize on the popularity of the TV show." *Processed Plastic Co.*, 675 F.2d at 857 (emphasis added). The court noted that in cases of intentional copying, the second comer is generally "presumed to have intended a confusing similarity of appearance and to have succeeded in doing so." *Id.* (citation omitted). Following this line of cases, the court held that the toymaker "did not introduce evidence to rebut the inference that its intentional copying of the 'General Lee' car effectively created confusion on the part of the consuming public." *Id.* at 858.

In the present case, we adopt a similar presumption. Given the undisputed facts that (1) defendants intentionally referred to the Boston Marathon on its shirts, and (2) purchasers were likely to buy the shirts precisely because of that reference, we think it fair to presume that purchasers are likely to be confused about the shirt's source or sponsorship. We presume that, at the least, a sufficient number of purchasers would be likely to assume—mistakenly—that defendants' shirts had some connection with the official sponsors of the Boston Marathon. In the absence of any evidence that effectively rebuts this presumption of a "likelihood of confusion," we hold that plaintiffs are entitled to enjoin the manufacture and sale of defendants' shirts.

Our holding that there is a rebuttable presumption in BAA's favor is consistent with the holdings of other courts in analogous cases of intentional copying. For example, the Second Circuit has held that when there is intentional copying of a product's trade dress, "the second comer will be presumed to have intended to create a con-

---

11. Because Warner had no registered trademark on its "General Lee" car, the *Gay Toys* and *Processed Plastic* cases were decided under § 43 of the Lanham Act, 15 U.S.C. § 1125 (1982) (forbidding false designations of origin), rather than § 32 of the Lanham Act, 15 U.S.C. § 1114 (1982), which refers only to registered marks. The opinions are equally relevant to § 32 cases, however.

fusing similarity of appearance and will be presumed to have succeeded." *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 618 F.2d 950, 954 (2d Cir.1980) (citations omitted). *See also Universal City Studios, Inc. v. Montgomery Ward & Co.,* 207 U.S. P.Q. 852, 857 (N.D.Ill.1980) (defendant's use of plaintiff's mark "Jaws" on a trash compactor, "with an intent to capitalize on the plaintiff['s] mark permits the court to draw the strong inference of likelihood of confusion"). *But see Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 791 n. 2 (9th Cir.1981) (stating, in contrast to *Universal City Studios,* that "in order to raise the inference of a likelihood of confusion, a plaintiff must show that the defendant intended to profit *by confusing consumers*") (emphasis in original).

In the present case, the facts clearly show that defendants intentionally referred to the Boston Marathon on their shirt in order to create an identification with the event and, thus, to sell their shirts. This evidence is itself sufficient to raise the inference of a likelihood of confusion. Given this presumption in favor of plaintiffs and the fact that defendants offered no evidence that would rebut the presumption, there is no genuine issue of material fact about the "likelihood of confusion."

We acknowledge that a trademark, unlike a copyright or patent, is not a "right in gross" that enables a holder to enjoin all reproductions. *See University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co.,* 703 F.2d 1372, 1374 (Fed.Cir. 1983). In Justice Holmes's words, "When the mark is used in such a way that does not deceive the public we see no such sanctity in the word as to prevent it being used to tell the truth. It is not taboo." *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). But when a manufacturer intentionally uses another's mark as a means of establishing a link in consumers' minds with the other's enterprise, and directly profits from that link, there is an unmistakable aura of deception. Such a use is, by its very nature, "likely to cause

confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Unless the defendant can show that there is in fact no likelihood of such confusion or deception about the product's connection to the trademark holder, such a use can be enjoined.

## VI. THE FINISH

Applying the pertinent law to the facts as considered in the light most favorable to defendants, we hold as follows:

(1) There is no genuine issue of fact with respect to the likelihood of confusion of goods. Nor is there any genuine issue of fact that the purchasing public will likely believe that the sponsor of the Boston Marathon produces, licenses or otherwise endorses defendants' shirts and other goods with logos referring to the Boston Marathon. These two findings stem from the same set of facts.

(2) The plaintiff, BAA, owns the name "Boston Marathon" and the defendants' shirts imprinted with logos suggesting that event constitute an infringement of BAA's mark. This includes the design "Boston; [runner/s]; 19xx," which was the subject of plaintiffs' amended complaint submitted on February 4, 1988.

(3) The judgment of the district court is reversed. Judgment shall issue for the plaintiffs,[12] which shall include the following permanent injunction:

> The defendants, Mark Sullivan d/b/a/ Good Life and Beau Tease, Inc., and all persons and entities acting in concert or in participation with them, are hereby enjoined from manufacturing or selling goods displaying the name "Boston Marathon" or any other design which is confusingly similar to or a colorable imitation of "Boston Marathon," including goods which are imprinted with "19xx Marathon; [runners]; Hopkinton—Boston," or with "Boston; [runner/s]; 1988."

Costs awarded to appellants.

---

**12.** In their motion for summary judgment the plaintiffs stated that their claim was confined to injunctive relief only. Thus there is no issue of damages.