UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 96-1206

THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, AFL-CIO, ET AL.,

Plaintiffs, Appellants,

v.

WINSHIP GREEN NURSING CENTER, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Torres* and Saris,** District Judges. 



Mark Schneider, with whom John M. West and Bredhoff & 
Kaiser, P.L.L.C. were on brief, for appellants. 
Richard L. O'Meara, with whom Charles P. Piacentini, Jr. and 
Murray, Plumb & Murray were on brief, for appellees. 



December 30, 1996




*Of the District of Rhode Island, sitting by designation.
**Of the District of Massachusetts, sitting by designation.

SELYA, Circuit Judge. In this eccentric case, the SELYA, Circuit Judge. 

International Association of Machinists and Aerospace Workers

(IAM or Union) charged an employer, Winship Green Nursing Center

(Winship), with violating the Lanham Act, 15 U.S.C. 1051-1127

(1994), through its unauthorized use of a service mark on

propaganda disseminated during a union organizing campaign.1 The

district court granted Winship's motion for brevis disposition, 

reasoning that the Union's claim failed to satisfy the Lanham

Act's jurisdictional requirements because (1) the parties were

not competing for the sale of commercial services, and (2)

Winship's admittedly unauthorized use of the mark was in

connection with services offered by the markholder rather than

services offered by the infringer. See International Ass'n of 

Machinists v. Winship Green Nursing Ctr., 914 F. Supp. 651, 655- 

56 (D. Me. 1996). The Union appeals. We affirm, albeit on a

different ground.

I. BACKGROUND I. BACKGROUND

We present the basic facts in the light most flattering

to the party vanquished by summary judgment. All the relevant

events occurred in 1994, and all dates refer to that year.

A A

In May the Union mounted a campaign to organize the

 

1An IAM official, Dale Hartford, is also a plaintiff, and
two affiliates of Winship (Hillhaven Corp. and First Healthcare
Corp.) are codefendants. Since the presence of these additional
parties does not affect the issues on appeal, we treat the
litigation as if it involved only the Union (as plaintiff-
appellant) and Winship (as defendant-appellee).

2

nonprofessional employees at Winship's facility in Bath, Maine.

Not surprisingly, management resisted this initiative and

exhorted the affected employees to vote against IAM's election as

a collective bargaining representative. As part of its retort

Winship hand-delivered two pieces of campaign literature to

employees in the putative bargaining unit. These handouts form

the basis for IAM's lawsuit.

1. The First Flier. In July Winship distributed a 1. The First Flier. 

three-page flier, the first page of which asks rhetorically:

WHAT WOULD YOU DO IF YOU GOT THE ATTACHED
LETTERS?
WOULD YOU BE ABLE TO FIND ANOTHER JOB?
HOW WOULD YOU PAY YOUR BILLS?
WOULD YOU WISH THAT THE MACHINISTS UNION HAD
NEVER GOTTEN IN AT WINSHIP GREEN?

The flier then advises recipients that "IT'S NOT TOO LATE" and

implores them to "GIVE [certain named managers] A CHANCE" by

"VOT[ING] NO ON AUGUST 4." The letters, addressed individually

to particular employees and dated one year after the scheduled 

election, comprise the second and third pages of the flier. One

letter purports to be written on the Union's letterhead, complete

with a reproduction of the IAM service mark (consisting of a set

of machinist's tools surrounded by a gear and the IAM name)2 and

the facsimile signature of an IAM plenipotentiary, Dale Hartford.

 

2Service marks and trademarks function to identify the
source of services and goods, respectively. The difference
between the two types of marks is not relevant here, and thus we
will apply case law involving either form. See Star Fin. Servs., 
Inc. v. AASTAR Mortgage Corp., 89 F.3d 5, 8 n.1 (1st Cir. 1996); 
Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815 
n.1 (1st Cir. 1987).

3

This missive suggests that the Union had notified Winship of its

obligation, pursuant to an invented collective bargaining

agreement, to terminate the recipient's employment because of her

failure to pay certain assessments (e.g., union dues and an

initiation fee). The other epistle, signed by Winship's director

of operations, is also postdated. It acknowledges Winship's

receipt of the notice and professes to inform the addressee that

the company must honor the Union's request.

2. The Second Flier. The remaining piece of campaign 2. The Second Flier. 

literature, disseminated by Winship a few days before the

election, urges the reader to vote against unionization and warns

that union membership will bring significant financial burdens.

This flier contains a simulated invoice inscribed on what

purports to be IAM's letterhead (and which bears the IAM service

mark). Under a heading that reads "PAYABLE TO THE MACHINISTS

UNION BY [employee's name]", the invoice lists amounts designated

as union dues, an initiation fee, and fines.3 Commentary,

undiluted by subtlety, accompanies this listing: "NO MATTER WHAT

THE UNION HAS TOLD YOU JUST ASK THE EMPLOYEES AT LOURDES

HOSPITAL" AND "JUST ASK THE 13 EMPLOYEES AT GENERAL ELECTRIC IN

SOUTH PORTLAND WHO WERE FINED FOR CROSSING THE PICKET LINE

THERE." Large, bold letters at the bottom of the invoice

proclaim: "WITHOUT THE MACHINISTS UNION, DO NOT PAY THIS BILL."

 

3The stated amounts are not only apocryphal but also
extravagant. During the organizing drive, IAM repeatedly
declared that there would be no initiation fee and that no
worker's monthly dues would exceed $20.

4

Notwithstanding Winship's tactics or, perhaps, due to

them the employees chose IAM as their collective bargaining

representative in the August 4 election.

B B

The Union proved to be a sore winner. It soon filed

suit against Winship alleging inter alia trademark infringement 

and unfair competition under the Lanham Act.4 The Union premised

its federal claims on the theory that Winship's unauthorized use

of the registered service mark occurred "in connection with . . .

services," namely, IAM's representational services, and thereby

transgressed sections 32(1) and 43(a) of the Lanham Act. See 15 

U.S.C. 1114(1)(a) & 1125(a) (quoted infra note 5). The 

district court rejected this theory for the reasons previously

mentioned. See IAM, 914 F. Supp. at 655-56. This appeal 

followed.

II. THE SUMMARY JUDGMENT STANDARD II. THE SUMMARY JUDGMENT STANDARD

Though the case is unconventional, the generic legal

standard that we must apply is prosaic. Summary judgment is

appropriate in trademark infringement cases, as elsewhere, "if

the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

 

4IAM's complaint also embodied a salmagundi of pendent
state-law claims. The district court dismissed these claims
without prejudice coincident with the entry of summary judgment
on the federal claims. See IAM, 914 F. Supp. at 656. We 
understand that the Union is pursuing these claims in a separate
state court action. Finally, the complaint sought injunctive
relief under the Norris-LaGuardia Act, 29 U.S.C. 101-115
(1994), but the Union now concedes the infirmity of this request.

5

that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."

Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir. 

1989) (quoting Fed. R. Civ. P. 56(c)). Generally speaking, a

fact is "material" if it potentially affects the outcome of the

suit, see Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 

1990), and a dispute over it is "genuine" if the parties'

positions on the issue are supported by conflicting evidence, see 

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). While 

an inquiring court is constrained to examine the record in the

light most favorable to the summary judgment opponent and to

resolve all reasonable inferences in that party's favor, see 

Hachikian v. FDIC, 96 F.3d 502, 504 (1st Cir. 1996), defeating a 

properly documented motion for summary judgment requires more

than the jingoistic brandishing of a cardboard sword. This is

especially true in respect to claims or issues on which the

nonmovant bears the burden of proof; in such circumstances she

"must reliably demonstrate that specific facts sufficient to

create an authentic dispute exist." Garside, 895 F.2d at 48; see 

also Anderson, 477 U.S. at 256. 

We review de novo the district court's grant of summary

judgment. See Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 

181 (1st Cir. 1989). Moreover, an appellate tribunal is not

bound by the lower court's rationale but may affirm the entry of

judgment on any independent ground rooted in the record. See, 

e.g., Hachikian, 96 F.3d at 504; Garside, 895 F.2d at 49. 

6

III. ANALYSIS III. ANALYSIS

Our analysis proceeds in five parts.

A A

Trademark infringement and unfair competition laws

exist largely to protect the public from confusion anent the

actual source of goods or services. See, e.g., Star Fin. Servs., 

Inc. v. AASTAR Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996); 

DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605 (1st Cir. 1992), 

cert. denied, 509 U.S. 923 (1993); 3 J. Thomas McCarthy, McCarthy 

on Trademarks and Unfair Competition 23.01 (3d ed. 1996). The 

Lanham Act is cast in this mold. Generally speaking, the Act

proscribes the unauthorized use of a service mark when the

particular usage causes a likelihood of confusion with respect to

the identity of the service provider.5 See WCVB-TV v. Boston 
 

5Section 32(1) of the Lanham Act governs infringement
claims. It stipulates in pertinent part:
Any person who shall, without the
consent of the registrant 
(a) use in commerce any
reproduction, counterfeit, copy, or
colorable imitation of a registered
mark in connection with the sale,
offering for sale, distribution, or
advertising of any goods or
services on or in connection with
which such use is likely to cause 
confusion, or to cause mistake, or 
to deceive; . . .

shall be liable in a civil action
by the registrant . . . .

15 U.S.C. 1114(1) (emphasis supplied). Section 43(a) governs
unfair competition claims. It stipulates in pertinent part:
Any person who, on or in connection with any

7

Athletic Ass'n, 926 F.2d 42, 44 (1st Cir. 1991); see also Societe 

des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 

641 (1st Cir. 1992) (explaining in respect to trademarks that

"only those appropriations . . . likely to cause confusion are

prohibited"). Consequently, likelihood of confusion often is the

dispositive inquiry in a Lanham Act case. See, e.g., WCVB-TV, 

926 F.2d at 44; Pignons S.A. de Mecanique de Precision v. 

Polaroid Corp., 657 F.2d 482, 492 (1st Cir. 1981). So it is 

here.

B B

To demonstrate likelihood of confusion a markholder (or

one claiming by, through, or under her) must show more than the

theoretical possibility of confusion. See American Steel 

Foundries v. Robertson, 269 U.S. 372, 382 (1926) (requiring 

probable confusion); Star, 89 F.3d at 10 (requiring evidence of a 

substantial likelihood of confusion); accord 3 McCarthy, supra,  

23.01[3][a]. Just as one tree does not constitute a forest, an

 

goods or services, . . . uses in commerce any
word, term, name, symbol, or device . . . or
any false designation of origin . . . which 
(A) is likely to cause confusion, 
or to cause mistake, or to deceive
as to . . . the origin,
sponsorship, or approval of [such
person's] goods, services, or
commercial activities by another
person . . .

shall be liable in a civil action by any
person who believes that he or she is or is
likely to be damaged by such an act.

15 U.S.C. 1125(a) (emphasis supplied).

8

isolated instance of confusion does not prove probable confusion.

To the contrary, the law has long demanded a showing that the

allegedly infringing conduct carries with it a likelihood of

confounding an appreciable number of reasonably prudent

purchasers exercising ordinary care. See McLean v. Fleming, 96 

U.S. 245, 251 (1877); Mushroom Makers, Inc. v. R.G. Barry Corp., 

580 F.2d 44, 47 (2d Cir. 1978), cert. denied, 439 U.S. 1116 

(1979); Coca-Cola Co. v. Snow Crest Beverages, Inc., 162 F.2d 

280, 284 (1st Cir.), cert. denied, 332 U.S. 809 (1947). This 

means, of course, that confusion resulting from the consuming

public's carelessness, indifference, or ennui will not suffice.

See, e.g., United States v. 88 Cases, More or Less, Containing 

Bireley's Orange Beverage, 187 F.2d 967, 971 (3d Cir.) (inferring 

that "the legislature contemplated the reaction of the ordinary

person who is neither savant nor dolt, [and] who . . . exercises

a normal measure of the layman's common sense and judgment"),

cert. denied, 342 U.S. 861 (1951); see also Indianapolis Colts, 

Inc. v. Metropolitan Baltimore Football Club Ltd., 34 F.3d 410, 

414 (7th Cir. 1994) (explaining that the Lanham Act does not

"protect the most gullible fringe of the consuming public").

We typically consider eight factors in assessing

likelihood of confusion: (1) the similarity of the marks; (2)

the similarity of the goods (or, in a service mark case, the

services); (3) the relationship between the parties' channels of

trade; (4) the juxtaposition of their advertising; (5) the

classes of prospective purchasers; (6) the evidence of actual

9

confusion; (7) the defendant's intent in adopting its allegedly

infringing mark; and (8) the strength of the plaintiff's mark.

See Star, 89 F.3d at 10; Sullivan, 867 F.2d at 29. While this 

compendium does not conform easily to the peculiar facts of this

case, it is not intended to be either all-encompassing or

exclusive. See DeCosta v. CBS, Inc., 520 F.2d 499, 513-14 (1st 

Cir. 1975), cert. denied, 423 U.S. 1073 (1976). The listed 

factors are meant to be used as guides. See Astra Pharmaceutical 

Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 

(1st Cir. 1983). No one listed factor is determinative, and any

other factor that has a tendency to influence the impression

conveyed to prospective purchasers by the allegedly infringing

conduct may be weighed by the judge or jury in gauging the

likelihood of confusion. We completely agree with the authors of

the Restatement that "[n]o mechanistic formula or list can set

forth in advance the variety of factors that may contribute to

the particular marketing context of an actor's use." Restatement

(Third) of Unfair Competition 21 cmt. a (1995).

Two related points are worth making. First, because

the listed factors must be evaluated in context, any meaningful

inquiry into the likelihood of confusion necessarily must

replicate the circumstances in which the ordinary consumer

actually confronts (or probably will confront) the conflicting

mark. See, e.g., Libman Co. v. Vining Indus., Inc., 69 F.3d 

1360, 1362 (7th Cir. 1995), cert. denied, 116 S. Ct. 1878 (1996); 

Black Dog Tavern Co. v. Hall, 823 F. Supp. 48, 55 (D. Mass. 

10

1993). Second, Rule 56 places a special gloss upon the usual

analytic approach. On summary judgment the reviewing court must

decide whether the evidence as a whole, taken most hospitably to

the markholder, generates a triable issue as to likelihood of

confusion. See Sullivan, 867 F.2d at 29; Astra, 718 F.2d at 

1205; see also 3 McCarthy, supra, 23.11 (observing that, while 

legal precedent governs the analysis, the result of each case is

controlled by the totality of its facts).

Applying these principles, we conclude that the Union

bears the burden here of adducing "significantly probative"

evidence, Anderson, 477 U.S. at 249-50 (citation omitted), 

tending to show that an appreciable number of prospective voters

(i.e., employees within the defined bargaining unit) were in fact

likely to be confused or misled into believing that the service-

marked campaign literature was produced, sent, or authorized by

IAM. The Union has not reached this plateau.

C C

As we set the scene for the main thrust of our

analysis, we acknowledge that the campaign stump is an odd stage

for playing out a Lanham Act drama. In the typical commercial

setting, confusion as to the source of goods or services occurs

when there is an unacceptably high risk that a buyer may purchase

one product or service in the mistaken belief that she is buying

a different product or service. See, e.g., Star, 89 F.3d at 9. 

But the instant case is well off the beaten track. It does not

involve two entrepreneurs vying to sell competing products or

11

services in the traditional sense. Rather, IAM was angling to

represent the workers and, although Winship opposed that effort,

it was neither offering nor seeking to provide a similar service.

In the vernacular of the marketplace, IAM was "selling" its

services to prospective union members and Winship was "selling" a

negative the lack of a need for any such services or service-

provider.

This twist has significant implications for a court's

assessment of the likelihood of confusion. If we assume,

favorably to the Union, that confusion as to the source of the

documents bearing the IAM service mark may at least indirectly

deter prospective purchasers (voters within the bargaining unit)

from acquiring (voting for) IAM's representational services, that

deterrent will exist only if, and to the extent that, confusion

causes purchasers to be misinformed about the nature or value of

the services. We think it follows inexorably that, if the

electorate can readily identify Winship as the source of the

promotional materials, the deterrent vanishes. See, e.g., 

McIntyre v. Ohio Elections Comm'n, 115 S. Ct. 1511, 1519 n.11 

(1995) (suggesting that once people know the source of a writing,

they can evaluate its message, and, at that point, "it is for

them to decide what is responsible, what is valuable, and what is

truth") (citation and internal quotation marks omitted). In that

event, there is no misleading as to the genesis of the letters,

and the voters can assess whether the Winship-authored handouts

accurately describe the Union's services, or, instead, are merely

12

a manifestation of Winship's no-holds-barred commitment to

dissuade the voters from "purchasing" those services. Put

another way, knowledge as to the source of the materials dispels

incipient confusion.

The Union attempts to confess and avoid. It contends

that the recipients' ability to ascertain the source of the

documents does not necessarily negate confusion. This contention

hinges on the theory that employees may have thought that the

letters, even if delivered by the company, were actual IAM

documents which Winship procured and then draped in anti-union

invective. But that theory does not fit the facts: patently,

this is neither an instance in which an employer distributes

copies of a notice previously sent by a union to employees

elsewhere and adds anti-union commentary, nor one in which an

employer makes minor emendations to an authentic union document.

The letters and the invoice are composed around names and

circumstances indigenous to this particular organizational

effort. Among other things, the letters bear a date significant

in its relation to the scheduled election; they address each

Winship employee by name and home address; and they identify this

employer. Source-identifiers specific to the Winship election

are even more pervasive in the fictitious invoice.

The Union's fallback position seems to be that, even if

it is nose-on-the-face plain that the letters and the invoice are

not replicas of genuine IAM materials, the affected employees

still may have believed that they somehow were based on genuine

13

materials. We think this construct is both legally unsound and

factually unsupported. In the first place, a recipient's ability

to recognize that the alleged infringer, at a minimum, must have

substantially added to or altered a document alleviates any

confusion as to its immediate source. Cf. Warner Bros., Inc. v. 

American Broadcasting Cos., 720 F.2d 231, 246 (2d Cir. 1983) 

(suggesting that lack of substantial similarity leaves "little

basis" for asserting likelihood of confusion in a Lanham Act

claim). In the second place, even indulging the arguendo

assumption that the contrived documents were based on a real

scenario, the alterations are sufficiently extensive that an

ordinary recipient, possessing a modicum of intelligence, could

not help but recognize that Winship had tampered so substantially

with the documents that they could no longer be perceived as

emanating from the Union.6 In other words, the documents'

credibility would depend on the voters' assessment of whether

Winship was telling the truth. See McIntyre, 115 S. Ct. at 1519 

 

6An analogous principle in copyright law is instructive.
Absent direct evidence of copyright infringement, a plaintiff
must prove "substantial similarity" between the copyrighted and
contested materials. See, e.g., NEC Corp. v. Intel Corp., 10 
U.S.P.Q.2d 1177, 1183 (N.D. Cal. 1989). The applicable test is
"whether the work is recognized by an observer as having been
taken from the copyrighted source." Id. at 1184. Even if a work 
is copied, however, no copyright infringement exists if
substantial changes render the work unrecognizable. See v. 
Durang, 711 F.2d 141, 142 (9th Cir. 1983) (affirming grant of 
summary judgment for the defendant); NEC Corp., 10 U.S.P.Q.2d at 
1186-87; cf. A. Dean Johnson, Music Copyrights: The Need for an 
Appropriate Fair Use Analysis in Digital Sampling Infringement 
Suits, 21 Fla. St. U. L. Rev. 135, 158-59 (1993) (noting greater 
likelihood of fair use in copyright cases if alterations render
an original music recording unrecognizable).

14

n.11 (discussing the value of knowing "the identity of the

source" for the purpose of judging the truthfulness of ideas

contained in a writing). We conclude, therefore, with regard to

these documents, that as long as employees can ascertain either

who authored or who substantially modified the literature, they

will readily recognize the entire document (including the

letters, in one case, and the invoice, in the second case) as

propaganda, and they will be in a position to gauge its accuracy

accordingly.

This emphasis on source recognition takes into account

the setting and the juxtaposition of the parties. Labor-

management relations have not mellowed since Justice Clark

observed three decades ago that representational campaigns "are

ordinarily heated affairs . . . frequently characterized by

bitter and extreme charges, countercharges, unfounded rumors,

vituperations, personal accusations, misrepresentations and

distortions." Linn v. United Plant Guard Workers of Am., Local 

114, 383 U.S. 53, 58 (1966). Because exaggeration, sometimes 

crossing the line into outright falsehood, is a staple in such

campaigns, "consumers" (i.e., affected workers) are on notice

that both sides likely will embellish with scant regard for the

confining restraints imposed by the truth. See Baumritter Corp. 

v. NLRB, 386 F.2d 117 (1st Cir. 1967) (explaining that 

inaccuracies are indigenous to campaign propaganda in the labor

relations milieu). The acrimonious literature disseminated by

both parties indicates that this campaign was no exception to the

15

rule.7

D D

Having woven the contextual tapestry against which the

Union's claims must be viewed, we turn now to the octet of

factors that typically inform the likelihood of confusion. While

the strange configuration of this case renders certain of those

factors irrelevant or, at least, difficult to apply square pegs

never fit snugly in round holes we make the effort in the

interest of completeness. Moreover, other relevant circumstances

compensate to some degree for this lack of fit and we intersperse

them throughout our discussion. We deem such circumstances to be

of especially great importance here precisely because this case

falls well outside the customary confines of the Lanham Act.

1. Similarity of Marks. The service mark used by 1. Similarity of Marks. 

Winship is not merely similar; it is identical a photocopied

reproduction. Still, similarity is determined on the basis of

the designation's total effect, see, e.g., Pignons, 657 F.2d at 

487 (considering additional, source-identifying words printed on

goods and substantial differences in packaging), and infringement

"does not exist, though the marks be identical and the goods very

similar, when the evidence indicates no [likelihood of

confusion]." James Burrough Ltd. v. Sign of the Beefeater, Inc., 
 

7For example, one IAM flier of the "when did you stop
beating your wife?" variety, asks: "WHAT LIES OR HALF TRUTHS
DO[ES WINSHIP] PLAN TO SPREAD DURING OUR DEBATE?" The IAM
materials also describe anticipated "company tactics" or "tricks"
in unflattering terms and warn employees to "LOOK OUT FOR
CORPORATE TRAPS." The Winship literature, discussed above,
speaks for itself.

16

540 F.2d 266, 274 (7th Cir. 1976). What is more, we have

recognized that in certain circumstances otherwise similar marks

are not likely to be confused if they are used in conjunction

with clearly displayed names, logos or other source-identifying

designations of the manufacturer. See Aktiebolaget Electrolux v. 

Armatron Int'l, Inc., 999 F.2d 1, 4 (1st Cir. 1993); Pignons, 657 

F.2d at 487. Here, the lengthy propagandistic message that

Winship printed in large type on the fictitious invoice and the

conspicuous, easily identifiable fliers it sent to introduce the

letters dilute the inference that might otherwise be drawn from

the similarity between the marks.

2. Similarity of Services. Because the parties do not 2. Similarity of Services. 

offer competing services, there is no similitude. Furthermore,

even if the documents are evaluated in the abstract, we do not

think that any reasonable person, viewing them in their entirety

and in conjunction with the accompanying materials, would find

them similar to IAM's authentic campaign literature.

On the one hand, any similarity to actual IAM materials

is limited to the vitriolic tone, the presence of the IAM service

mark, and the facsimile signature. On the other hand, unlike any

genuine IAM communication, the letters are postdated by a full

year and address the employees as if they already had opted in

favor of union representation. The next piece of propaganda (the

invoice) contains anti-union messages that are longer and much

more prominent than any other text. And, moreover, in stark

contrast to handbills distributed by IAM which invariably urged

17

employees to vote "yes" (i.e., for a union), the letters at issue

were attached to rabidly anti-union fliers exhorting employees to

vote "no" (i.e., against a union). In short, the bogus letters,

when compared to the real McCoy, are distinctive in appearance

and antithetical in content. Given such gross dissimilarities,

it cannot reasonably be inferred that ordinarily prudent workers

would be likely to confuse the source of the letters. See Senco 

Prods., Inc. v. International Union of Elec. Workers, 311 F. 

Supp. 590, 592 (S.D. Ohio 1970) (finding no likelihood of

confusion as to sponsorship of handbills circulated by a union

bearing employer trademark in bold print on the first line,

followed by union identifiers of equal prominence).

3-5. Channels of Trade and Advertising; Classes of 3-5. Channels of Trade and Advertising; Classes of 

Prospective Purchasers. Following circuit precedent, see Equine Prospective Purchasers. 

Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 546 n.5 

(1st Cir. 1995), we address the next three factors in the

ensemble. The parties' channels of trade are widely disparate

(reduced to bare essence, IAM sells representational services

whereas Winship sells nursing home beds), and there is no

evidence that the channels advertising those services are

similar.

To be sure, as the election campaign picked up steam,

both parties propagandized (and, in that sense, advertised)

through the same medium (print), and both of them targeted

exactly the same narrowly-defined cadre of individuals. The

class of prospective purchasers is necessarily restricted to

18

those individuals and is, therefore, identical. Still, that

identicality does not advance the Union's cause in the special

circumstances of this case.

On this point, the requisite inquiry is not limited

merely to determining whether the class of prospective purchasers

is the same or different. Instead, a court called upon to assay

likelihood of confusion must ponder the sophistication of the

class, thereby taking account of the context in which the alleged

infringer uses the mark. See, e.g., Astra, 718 F.2d at 1206-07; 

HQ Network Sys. v. Executive Headquarters, 755 F. Supp. 1110, 

1118-19 (D. Mass. 1991). Here, the organizational effort began

in May. Among other things, the Union held open meetings and

sent the affected workers periodic "organizing updates." Thus,

by late July when Winship began to distribute the challenged

documents persons within the class could not help but know of

the ongoing campaign and of its excesses.

We must presume that the class members are of normal

intelligence, see McLean, 96 U.S. at 251; Church of the Larger 

Fellowship, Unitarian Universalist v. Conservation Law Found. of 

New Eng., Inc., 221 U.S.P.Q. 869, 873 (D. Mass. 1983), and the 

previous months' electioneering would have given them a certain

degree of enforced sophistication. Common sense dictates that

this group above all others would filter the rivals' claims

through the seine of this knowledge. Cf. Linn, 383 U.S. at 60-62 

(discussing the NLRB's toleration of abusive and inaccurate

statements made during organizational campaigns and agreeing that

19

the ultimate appraisal of such statements must be left to the

good sense of those voting in the elections). Accordingly, class

members were especially unlikely to be misled by Winship's

unauthorized use of the IAM mark.

6. Actual Confusion. IAM proffers Dale Hartford's 6. Actual Confusion. 

affidavit as the mainstay of its case (indeed, its solitary piece

of evidence) on the issue of actual confusion. The affidavit

states briefly that "several" employees asked whether Hartford

had in fact written the letter that bore his signature.8 It also

reports that one employee questioned whether she would be

required to pay $300 in dues and a $200 initiation fee. Hartford

opines that "these figures seem to have had to have come from

[the apocryphal union invoice]." This evidence, standing alone,

is insufficient to prove actual confusion.

The fundamental problem with the Hartford affidavit is

that, even taking its contents as literally true, it does not

undermine what is perfectly obvious from a reading of the record:

no person of ordinary prudence and normal intelligence, aware of

what was happening around her, would have been confused as to the

source or sponsorship of the letters. For one thing, the

inquiries to which Hartford alludes reveal at most that employees

doubted whether he would have written a letter unfavorable to the

very cause he had labored to promote. On their face, these
 

8Although Hartford recalled that these statements were made
in front of approximately ten other employees at a union meeting,
he claimed that he could not locate the list of attendees and,
consequently, could not name either the persons who made inquiry
of him or those who overheard the queries.

20

inquiries do not evince actual confusion as to the source of the

jury-rigged documents. See Restatement (Third) of Unfair 

Competition 23 cmt. c (1995) ("Evidence of inquiries by

customers as to whether the plaintiff and the defendant are

associated . . . may not establish the existence of actual

confusion if the nature of the inquiries indicates that consumers

perceive a difference between the designations and are skeptical

of the existence of a connection between the users.").

For another thing, skepticism is particularly rampant 

and wise as to claims made in the course of any organizing 

drive. In the course of this organizing drive a struggle which 

incited more than its share of hyperbole on both sides class

members had ample reason to be skeptical. They must have known

that Winship distributed the fliers (which embodied the letters),

and they therefore knew that the letters had to be viewed in

light of Winship's motivation. In all events, forewarned is

forearmed, see Miguel de Cervantes, Don Quixote de la Mancha 

(circa 1615), and, here, the Union disseminated literature in the

early going predicting that management would stoop to dubious

tactics.

The question about dues is an even thinner reed. A

lone inquiry does not indicate probable confusion of an

appreciable number of purchasers. See Mushroom Makers, 580 F.2d 

at 47. Regardless, this lone inquiry which questioned the

veracity of the prediction concerning union dues does not 

indicate confusion as to the source of the fictitious invoice. 

21

See Pignons, 657 F.2d at 490 (finding consumer's letter 

expressing surprise at perceived affiliation between competing

companies "clearly insufficient" to prove actual confusion).

The Union strives to persuade us that, no matter how

paltry the evidence of actual confusion, it is nonetheless

adequate to survive testing on summary judgment where we must

accept all reasonable inferences favorable to the nonmovant. We

are not convinced. The core purpose of the summary judgment

procedure is to "pierce the boilerplate of the pleadings" and

evaluate the proof to determine whether a trial will serve any

useful purpose. Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 

794 (1st Cir. 1992), cert. denied, 507 U.S. 1030 (1993). 

Consequently, summary judgment cannot be sidestepped by pointing

to evidence that is merely colorable or suggestive, see, e.g., 

Mack, 871 F.2d at 181, or evidence that lacks substance, see, 

e.g., Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 

1991), cert. denied, 504 U.S. 985 (1992), or evidence that is 

inherently incredible, see, e.g., United States v. Joost, 92 F.3d 

7, 14 (1st Cir. 1996).

In this instance, the Union submitted no affidavits

from any individuals who personally received the campaign

literature,9 and we think that it is inherently implausible to
 

9In point of fact, the only such affidavit in the record 
that of an employee named Gail Snipe states unequivocally that
she "recognized all of the materials . . . to be my employer's
campaign materials." She adds: "The face of the documents as
well as the context in which the documents were presented made it
clear that the campaign materials were from the employer, not the
IAM."

22

infer from the inquiries described by Hartford that prospective

voters actually were confused as to the source of the materials.

The summary judgment paradigm requires us to draw and respect

only reasonable inferences; we need not infer that which is 

farfetched or fantastic. See Sheinkopf v. Stone, 927 F.2d 1259, 

1262 (1st Cir. 1991); Medina-Munoz v. R.J. Reynolds Tobacco Co., 

896 F.2d 5, 8 (1st Cir. 1990); Raskiewicz v. Town of New Boston, 

754 F.2d 38, 45 (1st Cir.), cert. denied, 474 U.S. 845 (1985). 

Here, the face of the documents, the accompanying fliers, the

environment in which they were distributed, and the lack of

significantly probative evidence of actual confusion combine to

render unreasonable the inference that IAM would have us draw.

7. Intent. IAM relies heavily on the principle that 7. Intent. 

when an alleged infringer intentionally copies a trademark, it

may be presumed that she intended to cause confusion and profit

thereby.10 See Sullivan, 867 F.2d at 34. But the presumption is 

inapposite in situations where there is no persuasive evidence of

any intent to use the mark to suggest official sponsorship. See 

WCVB-TV, 926 F.2d at 45-46 (attaching considerable importance to 

the alleged infringers' contemporaneous offer to broadcast

disclaimers, thus making clear that they were not official

sponsors of the trademarked product).
 

10This rebuttable presumption works with maximum efficiency
in the commercial setting. There, an infringer typically copies
a trademark to palm off her own goods as those of a recognized
manufacturer, thereby free riding on the markholder's reputation
and goodwill. See generally McCarthy, supra, 25.01. The 
presumption works less well in cases that do not involve
competitors.

23

The template of this case is similar to that of WCVB- 

TV. Winship incorporated the bogus documents in fliers 

prominently displaying anti-union commentary and containing pleas

by named managers for votes against unionization. In addition,

the fake invoice itself includes what amounts to a conspicuous

disclaimer. Under the circumstances, no reasonable factfinder

could conclude, notwithstanding Winship's purposeful

misappropriation of the IAM service mark, that the company

intended to mislead employees about the source of the handouts.

8. Strength. Under the Lanham Act strong marks enjoy 8. Strength. 

the greatest protection against infringement. See Aktiebolaget, 

999 F.2d at 5; Pignons, 657 F.2d at 492. The IAM service mark is 

robust, having been duly registered and widely promoted for over

thirty years. But the muscularity of a mark, in and of itself,

does not relieve the markholder of the burden to prove a

realistic likelihood of confusion. See Aktiebolaget, 999 F.2d at 

5; Pignons, 657 F.2d at 492. Because the Union has utterly 

failed to produce evidence sufficient to meet that burden, see 

supra, the mark's strength cannot carry the day. 

E E

After giving due weight to each factor and considering

the unique circumstances that necessarily inform our analysis, we

find no colorable basis for a likelihood of confusion, and,

hence, no trialworthy Lanham Act claim. In reaching this

conclusion we stress the significance of the factual setting.

Here, the ambiance powerfully influenced the impression conveyed

24

by Winship's unauthorized use of the IAM service mark. The

parties' preparations for the election inflamed the historic

enmity between labor and management and colored the

communications distributed by both protagonists. The climate

inevitably conditioned voters to view with suspicion any claims

made by either party about the other. This suspicion peaked

shortly before the election, and that is when the offending

documents surfaced. Moreover, the documents, when received, were

affixed to clearly identifiable management propaganda. These

additional, relevant circumstances counsel persuasively against

any realistic possibility of confusion as to 

the source or sponsorship of the mismarked literature.

IV. CONCLUSION IV. CONCLUSION

Considering the record as a whole in the light most

favorable to the summary judgment loser, we hold that there is no

triable issue of fact as to likelihood of confusion. It is simply

inconceivable that employees who received the challenged literature at

the height of a fiercely disputed union organizing campaign would,

upon even a cursory glance, be apt to believe that IAM either

distributed or contributed in any meaningful way to these vociferously

anti-union tracts.

We add a postscript. The employer wins this appeal, but not

our admiration. While we strongly disapprove of Winship's

misappropriation of IAM's service mark, however, the Union has other

available remedies to redress that infraction. See, e.g., Linn, 383 

U.S. at 61 (approving state-law remedy in analogous circumstances).

25

For our part, we are unwilling to stretch the Lanham Act into

unfamiliar contours simply for the sake of punishing conduct that we

deplore. While we are not willing to venture quite as far into

uncharted waters as our concurring colleague after all, unlike the

authorities on which she primarily relies, see post, this case 

involves neither a political campaign nor a parody the policy

concerns that undergird her views fortify our resolve to hold the

line. By like token, the special circumstances that the district

court described at length, see IAM, 914 F. Supp. at 653-56 such as 

the noncommercial nature of the unauthorized use, the absence of any

competition between the parties in the representational services

market, and the fact that Winship did not appropriate the mark for use

"in connection with" any services of its own point in the same

direction.11 We need go no further.

Affirmed. Affirmed. 

Concurring Opinion Follows 
 

11We take no view of the concurring opinion's suggested
holding, the grounds on which the district court premised its
ruling, or the other theories urged by Winship in support of the
judgment below. While the Union's case may be vulnerable on
several fronts, the absence of any meaningful confusion renders
further comment supererogatory.

26

Saris, U.S.D.J.

I concur on the ground that Winship Green's misuse of the

union's trademark in its campaign literature during the union election

is not a commercial use of the mark adumbrated by Sections 32 or

43(a) of the Lanham Act, as amended, 15 U.S.C. 1114(1), 1125

(1994).

I I

The union alleges that Winship Green's use of its trademark

during the election violated Sections 32 and 43(a) of the Lanham Act.

A A

Section 32 of the Lanham Act concerns "trademark

infringement" and proscribes misuse of another's registered trademark

in commerce "in connection with the sale, offering for sale,

distribution, or advertising of any goods or services on or in

connection with which such use is likely to cause confusion, or to

cause mistake, or to deceive."12 15 U.S.C. 1114(1)(a) (1994).
 

12 Section 32 of the Lanham Act, as amended, states in
pertinent part:

(1) Any person who shall, without the consent of the
registrant --
(a) use in commerce any reproduction, counterfeit,
copy, or colorable imitation of a registered mark
in connection with the sale, offering for sale,
distribution, or advertising of any goods or
services on or in connection with which such use
is likely to cause confusion, or to cause mistake,
or to deceive ...
* * *
shall be liable in a civil action by the registrant for
the remedies hereinafter provided....

27

B B

Section 43(a) provides broader protection, prohibiting

"unfair competition" by use of any mark, registered or not. See Two 

Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). Section 

43(a) prohibits two types of activities: "false designations of

origin," 15 U.S.C. 43(a)(1)(A) ("Prong (A)") and "false

descriptions," 15 U.S.C. 43(a)(1)(B) ("Prong (B)").13 See Truck 

Components, Inc. v. K-H Corp., 776 F. Supp. 405, 409 (N.D. Ill. 1991); 

3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition  

27.02[3] (3d ed. 1996) (discussing history of the "two prongs" of 

 

15 U.S.C. 1114(1) (1994).

13 Section 43(a) of the Lanham Act, as amended, states in
pertinent part:

1125. False designations of origin and false 
descriptions forbidden 
(a) Civil action. (1) Any person who, on or in
connection with any goods and services, or any
container for goods, uses in commerce any word, term,
name, symbol, or device, or any combination thereof, or
any false designation of origin, false or misleading
description of fact, or false or misleading
representation of fact, which --
(A) is likely to cause mistake, or to deceive as
to the affiliation, connection, or association of
such person with another person, or as to the
origin, sponsorship, or approval of his or her
goods, services, or commercial activities by
another person, or
(B) in commercial advertising or promotion,
misrepresents the nature, characteristics,
qualities, or geographic origin of his or another
person's goods, services, or commercial
activities.
shall be liable in a civil action by any person who
believes that he or she is or is likely to be damaged
by such act.

15 U.S.C. 1125(a) (1994) (emphasis in original).

28

43(a) -- 43(a)(1)(A) ("trademark infringement") and 43(a)(1)(B)

("false advertising").

Prong (A)14 prohibits false designations of the origin or

sponsorship of goods or services. 15 U.S.C. 1125(a)(1)(A) (1994).

Typical claims under prong (A) would involve a new trademark that was

confusingly similar to an already established one, or an attempt by a

defendant to "palm-off" its goods as those of a competitor by use of

the competitor's mark. See Truck Components, 776 F. Supp. at 409; 

McCarthy on Trademarks, supra, at 27.02[4] (describing these claims 

as "trademark infringement"). 

In contrast, the protection under prong (B) is very

different. Following its amendment in 1988, prong (B) creates

liability for misrepresentations in commercial advertising or

promotion as to the "nature, characteristics, qualities or geographic

origin" of another person's goods or services. 15 U.S.C. 1125(a)(1) 

(1994); see also Trademark Law Revision Act, Pub. L. 100-662, 132, 

102 Stat. 3946 (1988); U.S. Healthcare, Inc. v. Blue Cross of Greater 

Philadelphia, 898 F.2d 914, 921 (3d Cir. 1990) (discussing effect of 

1988 amendment to Lanham Act); McCarthy on Trademarks, supra, at  

27.02[4]. The Senate Committee Report accompanying this amendment

explained the need for this addition to the Act as follows:

In one important area, however, the courts
have refused to apply the section. Based on a
1969 seventh circuit decision, the courts have
held that Section 43(a) applies only to
misrepresentations about one's own products and
 

14 In 1992 Congress redesignated paragraphs (1) and (2) of
section 43(a) as subparagraphs (A) and (B). See Oct. 27, 1992, 
Pub. L. 102-542, 3(c), 106 Stat. 3568.

29

services; it does not extend to misrepresentations
about competitor's products or services. Bernard 
Food Indus. v. Dietene Co., 415 F.2d 1279, 163 
USPQ 265 (7th Cir. 1969), cert. denied, 397 U.S. 
912, 164 USPQ 481 (1970). The committee agrees
that this effect is illogical on both practical
and public policy levels and that the public
policy of deterring acts of unfair competition
will be served if Section 43(a) is amended to make
clear that misrepresentations about another's
products are as actionable as misrepresentations
about one's own.

S. Rep. No. 515, 100th Cong., 2d Sess. (1988), reprinted in 1988 

U.S.C.C.A.N. 5577; see also McCarthy on Trademarks, supra, at  

27.02[4] (stating that 1988 amendment codified "two prongs" of 

43(a): "part one relat[ing] to . . . unregistered trademark,

tradename and trade dress infringement claims, and part two

relat[ing] to . . . false advertising (as well as trade libel)

claims"). Thus, prong (B) prohibits misrepresentations about the

quality of a defendant's own goods -- even where the

misrepresentations do not tend to confuse its goods with those of

a competitor or otherwise misstate the origin of the goods -- as

well as affirmative misrepresentations about another's products.

Truck Components, 776 F. Supp. at 409 (citing In re Uranium 

Antitrust Litigation, 473 F. Supp. 393, 408 (N.D. Ill. 1979)); 

see also McCarthy on Trademarks, supra, at 27.04 (describing 

elements of prima facie case under prong (B)).  

II II

I am in agreement with the majority that the origin and

sponsorship of the allegedly infringing documents was never in

doubt. With respect to section 43(a) of the Lanham Act, prong

(A) is inapplicable because there is no evidence, or even

30

contention, that the company used the union's mark to deceive

bargaining unit members as to the affiliation of the company with

the union or as to the sponsorship of its services by the union.

Quite the contrary. 

However, there is evidence that Winship Green used the

union's trademark to misrepresent the characteristics and nature

of the union's services (i.e., the amount of union dues or the

purportedly draconian results of failure to pay them), thereby

implicating prong (B), governing false descriptions. Cf. Energy 

Four, Inc. v. Dornier Medical Systems, Inc., 765 F. Supp. 724, 

730 (N.D. Ga. 1991) (describing cause of action for

misrepresentation under Section 43(a)(1)(B) and collecting

cases); Brandt Consol., Inc. v. Agrimar Corp., 801 F. Supp. 164, 

174 (C.D. Ill. 1992) (same); McCarthy on Trademarks, supra, at  

27.04 (same). Because this evidence that the company

misrepresented the union's services may be sufficient for the

fact-finder to find confusion as to the "nature, characteristics,

[or] qualities" of the union's services, I would not allow

summary judgment for the company under prong (B) on the ground of

a lack of confusion.

III III

A firm ground for summary judgment, it seems to me, is

that the Lanham Act creates no liability because the deception

did not occur in connection with commercial sales or advertising,

as required under the Act, but rather in campaign hand-outs. 

The Lanham Act protects only against certain commercial 

31

uses of trademarks. Section 32 governs the use of a registered

mark "in commerce . . . in connection with the sale, offering for

sale, distribution, or advertising of any goods or services." 15

U.S.C. 1114(1)(a) (1994). Section 43(a) is likewise limited to

uses of marks "in commerce," 15 U.S.C. 1125(a)(1) (1994), which

the Act defines as using or displaying a mark in the sale or

advertising of goods or services,15 see 15 U.S.C. 1127 (1994). 

And, section 43(a)(1)(B) limits misrepresentation claims to those

cases involving "commercial advertising or promotion." 15 U.S.C.

1125(a)(1)(B) (1994).

While there is no appellate case directly on point,

trial courts have rejected efforts to extend the Lanham Act to

cases where the defendant is not using or displaying the

trademark in the sale, distribution or advertising of its goods

or services. See Lucasfilm Ltd. v. High Frontier, 622 F. Supp. 

931, 934 n.2 (D.D.C. 1985) (rejecting the claim that advertising

companies could be held liable for using the trade name "Star

Wars" in the political debate over a national policy because the
 

15 15 U.S.C. 1127 states in pertinent part:

The term "use in commerce" means the bona fide use of a
mark in the ordinary course of trade, and not made
merely to reserve a right in a mark. For purposes of
this chapter, a mark shall be deemed to be in use in
commerce --
* * *
(2) on services when it is used or displayed in
the sale or advertising of services and the
services are rendered in commerce, or the services
are rendered in more than one State or in the
United States and a foreign country and the person
rendering the services is engaged in commerce in
connection with the services.

32

trademark laws only reach activities in which a trademark is used

in connection with selling or advertising services of commercial

or noncommercial defendants); Stop the Olympic Prison v. United 

States Olympic Comm., 489 F. Supp. 1112, 1124 (S.D.N.Y. 1980) 

(expressing serious doubts as to whether the Lanham Act applies

to the deceptive use of the Olympic trademark by a group opposing

the conversion of Olympic facilities into a prison, in part

because "there is no suggestion that the alleged deception was in

connection with any goods or services"); Reddy Communications, 

Inc. v. Environmental Action Found., 477 F. Supp. 936, 946 

(D.D.C. 1979) (rejecting claim that an environmental group's

caricature of an energy industry service mark violated the Lanham

Act where the company failed to prove that the environmental

group used the service mark to "identify or promote" the sale of

its publications); see generally L.L. Bean, Inc. v. Drake 

Publishers, Inc. 811 F.2d 26, 32 (1st Cir. 1987) (holding under 

a state anti-dilution state that a parody was not a commercial

use of plaintiff's mark because the publisher "did not use Bean's

mark to identify or market goods or services to consumers"),

cert. denied, 483 U.S. 1013 (1987). 

Nonetheless, some forms of union-related activity may

constitute commercial sale or advertising that is protected under

the Act. See, e.g., Brach Van Houten Holding, Inc. v. Save 

Brach's Coalition for Chicago, 856 F. Supp. 472, 475-476 (N.D. 

Ill. 1994) (finding Lanham Act protection applicable where union

used company logo in connection with the sale and distribution of

33

its buttons and stickers and solicitation of donations to support

the coalition's opposition to a plant closing and was likely to

cause confusion as to the company's affiliation with, or approval

of, defendant's proposals); Marriott Corp. v. Great Am. Serv. 

Trades Council, AFL-CIO, 552 F.2d 176, 179 (7th Cir. 1977) 

(rejecting the union's contention that the National Labor

Relations Board had exclusive jurisdiction over an action for

trademark infringement arising under the Lanham Act where the

union allegedly used the company's trademark in advertisements

which suggested an affiliation between the company and the union

in advertising its services to prospective employees). However,

such commercial activity is simply not present here.

Accordingly, the union's limited property right under

the Lanham Act against commercial misuse of its trademark is not

implicated in this case. See generally Lucasfilm Ltd., 622 F.2d 

at 933 ("It is well established that the property right conferred

by a trademark is very limited."). While the union rightfully

complains about the company's unfair tactics, it must find its

federal remedy for deceptive campaign literature under the

National Labor Relations Act, 29 U.S.C. 141 et seq. (1994). 

See Linn v. United Plant Guard Workers of Am., Local 114, 383 

U.S. 53, 60 (1966) (permitting libel action under state law for

defamatory statements published during a union organization

campaign and discussing authority of the National Labor Relations

Board to set aside elections where "a material fact has been

misrepresented in the representation campaign; opportunity for

34

reply has been lacking; and the misrepresentation has had an

impact on the free choice of the employees participating in the

election"). 

Because the Court reaches the same conclusion for

somewhat different reasons, I join in its judgment.

35